[No. B086429. Second Dist., Div. Two. Oct. 5, 1995.]

FORT MOJAVE INDIAN TRIBE et al., Plaintiffs and Appellants, v.
CALIFORNIA DEPARTMENT OF HEALTH SERVICES et al.,
Defendants and Appellants;
US ECOLOGY, INC., Real Party in Interest and Appellant;
CALIFORNIA RADIOACTIVE MATERIALS MANAGEMENT FORUM,
Intervener and Appellant.

## COUNSEL

Cadwalader, Wickersham & Taft, Roger Lane Carrick, David B. Sadwick, Aimee Dominguez Silvers, Hannah Bentley, Michael Lozeau and Allison Holdorff for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, John H. Sanders and Paula Lauren Gibson, Deputy Attorneys General, for Defendants and Appellants.

Latham & Watkins, Karl S. Lytz, Kimberley M. McCormick and Darius Ogloza for Real Party in Interest and Appellant.

Beveridge & Diamond, James L. Meeder, Jennifer L. Hernandez and Katherine B. Steuer for Intervener and Appellant.

## OPINION

**FUKUTO, J.**—This case concerns the California Department of Health Services' (DHS) approval of an environmental impact report (EIR) and license for the construction and operation of a low-level radioactive waste (LLRW) disposal facility at Ward Valley, San Bernardino County, in the Mojave Desert. Petitioners, the Fort Mojave Indian Tribe (Tribe) and three nonprofit corporations,[1] sought a writ of mandate invalidating DHS's decisions certifying the EIR and granting the license to real party in interest US Ecology, Inc. (US Ecology).[2] California Radioactive Materials Management Forum (Forum), an organization of institutions that generate LLRW and require its disposal, intervened in opposition.[3] The trial court gave judgment denying the petition on all substantive grounds, but requiring that the approvals be set aside and reconsidered in light of a scientific report, issued

---

[1] Los Angeles Physicians for Social Responsibility, Southern California Federation of Scientists, and Committee to Bridge the Gap (Committee).

[2] References to DHS include its director, who also was named as a respondent.

[3] We refer to DHS, US Ecology, and the Forum collectively as respondents.

after their grant, which discussed the possibility of contamination of the Colorado River from the facility.

All parties have appealed. Petitioners seek broader relief from DHS's decisions, while respondents seek reversal of the limited grant of the writ and thus denial of the petition. We have concluded that there was insufficient basis to remand the matter for reconsideration, and that petitioners' other grounds for setting aside DHS's disposition were correctly determined to be without merit. We therefore reverse with directions to deny the petition.

STATEMENT OF THE CASE

1. *The Administrative Proceedings.*

The general background of the proceedings under review is described in *California Radioactive Materials Management Forum* v. *Department of Health Services* (1993) 15 Cal.App.4th 841, 848-854 [19 Cal.Rptr.2d 357] (*CalRad*), which also concerned those proceedings.[4] In brief, LLRW is statutorily defined by excluding certain other radioactive material, the responsibility for safe disposal of which generally resides in the federal government. LLRW comprises a variety of radioactive materials, used in or generated by many medical, industrial, research, and other activities and facilities. (See 15 Cal.App.4th at p. 849.) Only six facilities for land disposal of LLRW have previously been established, between 1963 and 1971. Most of them have since been closed. (*Id.* at pp. 849-850.)

In 1980 and again in 1985, Congress enacted legislation to encourage every state to provide for disposal of its own LLRW, preferably on a regional basis pursuant to interstate compacts. (See *CalRad, supra,* 15 Cal.App.4th at pp. 850-851.) In response, California enacted a series of amendments to its 1961 Radiation Control Law (Health & Saf. Code, § 25800 et seq. (RCL)). The amendments first required DHS, the agency already responsible for issuing licenses under the RCL (Health & Saf. Code, § 25810), to plan for the disposal of California's LLRW. (E.g., Health & Saf. Code, §§ 25811.5, 25811.7.) The Legislature then directed the Governor to enter into an interstate compact, and DHS to select a private contractor, for a waste disposal facility. (See *CalRad, supra,* at pp. 851-852.)

In 1987, California entered into the Southwestern Low-Level Radioactive Waste Disposal Compact (Health & Saf. Code, §§ 25877-25878 (compact)),

---

[4]*CalRad* held that DHS was not required to hold a trial-type hearing, under the Administrative Procedure Act (Gov. Code, § 11340 et seq. [APA]), before granting US Ecology's license.

with Arizona, North Dakota, and South Dakota. The compact provided that this state would be the "host state" for a regional LLRW disposal facility for the first 30 years, the role thereafter to be extended or transferred at California's option. (Health & Saf. Code, § 25878, art. 2, subd. (G), art. 4, subd. (C)(1).) The compact obligated California to cause the facility to be developed on a timely basis, and to assure, among other things, protection and preservation of public health and safety in its siting, licensing, operation, closure, and long-term care. (Health & Saf. Code, § 25878, art. 4, subds. (E)(1), (2); see *CalRad, supra*, 15 Cal.App.4th at p. 852.)

Pursuant to its statutory duty, DHS in 1985 selected US Ecology as the contractor, and prospective licensee, for the facility. US Ecology had operated four of the six previous LLRW facilities.

Both parties then turned to examining possible sites for the facility. Sixteen were considered. After extensive surveys, analyses, consultations and scientific studies, DHS selected as the preferred site among three candidates a location at Ward Valley, situated in a closed surface basin in the southeastern corner of the state, about 20 miles (including mountains) from the Colorado River. The site is extremely arid, with average annual rainfall of less than 5 inches but average annual evaporation of 80 to 100 inches, and with groundwater about 650 feet below surface, all helpful conditions for secure burial of enclosed waste.

The Ward Valley site was (and still is) owned by the federal government, through the Department of the Interior's Bureau of Land Management (BLM). Employment of the site therefore required transfer of title to California. The federal transfer in turn required review and an environmental impact statement under the National Environmental Policy Act (42 U.S.C. § 4321 et seq.). DHS's own licensing of US Ecology also required environmental review, and an EIR, under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)).[5] DHS and BLM agreed to prepare the EIR and environmental impact statement as a joint document.

Between 1989 and 1993, the DHS regulatory process proceeded on two overlapping tracks: preparation of the EIR under CEQA, and completion and review of US Ecology's license application under the RCL. The initial,

---

[5]Provisions of CEQA are cited by Public Resources Code section alone. CEQA's implementing Guidelines, codified at title 14, California Code of Regulations, section 15000 et seq., are cited as Guidelines. The Supreme Court has instructed that the Guidelines are to be afforded great weight by the courts, unless clearly unauthorized or erroneous under CEQA. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).)

11-volume license application was followed by DHS's propounding and US Ecology's responding to 4 sets of amplifying and clarifying interrogatories. The application focused on US Ecology's proposed methods for waste disposal, in compliance with federal regulations, including description of the types, amounts, and sources of waste to be received. The proposed disposal method involved burying the waste, enclosed in sealed containers, in a series of trenches, which would be refilled with earth and planted over. The trenches would be unlined, out of concern for moisture-dispersal, with a view toward prevention of waste migration.

As prepared and augmented, the license application became part of the EIR, physically or by reference. The draft EIR was released for public comment in June 1990. (See Guidelines, § 15084 et seq.) In July 1990, concurrently with BLM's public hearings on the draft EIR (no such separate hearings being required by CEQA), DHS held public comment hearings on the license application. The final EIR, including responses to comments received on the draft, was issued in April 1991. In the EIR, DHS concluded that the possibility for contamination of the Colorado River by accidental release and long-term migration of radioactive matter from the facility was not realistic, in light of (among other things) the physical and temporal inaccessibility of local groundwater and the separation between the Ward Valley and the river. In July 1991, DHS held recorded hearings on the license application, before an administrative law judge. (See Health & Saf. Code, § 25845, subd. (a).)

The state licensing process, and the federal transfer, then became embroiled in proceedings at other levels of government. In 1992, the state Senate Rules Committee extracted a commitment from DHS to hold an additional, APA-type hearing on the project. That requirement ultimately was ruled to lack basis in law, and DHS was directed to proceed to consider the license application without regard to it. (*CalRad, supra,* 15 Cal.App.4th 841.) In the meantime, a new administration and Secretary of the Interior had assumed office. Secretary Bruce Babbitt resolved to proceed deliberately with the site transfer, and asked Governor Wilson to hold further hearings to that end.

In February 1993, three United States Geological Survey (USGS) geologists with professional experience in the area—Howard Wilshire, Keith Howard, and David Miller—wrote to Secretary Babbitt, stating that they had not been "consulted in the planning process," and offering consultation. The Secretary's special assistant requested their comments. On June 2, 1993, Wilshire, Howard and Miller responded with a three-page memorandum

based on their review of the draft EIR of three years earlier (the Wilshire memorandum).[6] The memorandum set forth seven alleged deficiencies in that EIR, devoting a paragraph to each. The three that the authors labeled significant were as follows.

First, the authors concluded, from the persistence of vegetation downslope from flood control levees in the desert, that shallow subsurface water flow persisted; hence, infiltration of the proposed LLRW facility's trenches by such flow had to be considered. Second, the EIR allegedly gave "[n]o information" about the properties of the unsaturated zone and the potential for groundwater contamination should waste leak. Third, the EIR allegedly lacked information about hydrologic interconnection of the Ward Valley and Colorado River basins, and although the selection of a topographically closed basin was "a first step," it was not sufficient in view of "our general state of ignorance on hydrologic connections." The authors stated that groundwater systems elsewhere in the vicinity did cross between topographically separated basins.

On June 25, 1993, US Ecology sent Secretary Babbitt a four-page summary response to the Wilshire memorandum, under cover of a letter protesting the authors' failure to consult with DHS or review the final EIR and license application, which had addressed the stated concerns. With respect to the three significant issues, the response cited studies conducted during the license and EIR approval process which had produced negative conclusions about subsurface flow, the properties and propensities of the unsaturated zone, and the possibility of hydrologic connection between the two basins. DHS included both the Wilshire memorandum and US Ecology's response in the final EIR.

On August 30, 1993, the Department of the Interior announced a proposed designation of critical habitat for the desert tortoise, a threatened species under the Endangered Species Act (16 U.S.C. § 1531 et seq.). The proposal included the project site among over 6,000,000 acres to be so designated. DHS already had extensively studied the effects of the project on the tortoise and its desert habitat, and had included findings and mitigation measures in the EIR.

On September 16, 1993, Governor Wilson responded to Secretary Babbitt's request that a hearing be conducted to inform the federal decision, and agreed to do so. Expressing satisfaction with DHS's performance of its assigned role, and the sufficiency of the administrative record, the Governor

---

[6]Wilshire had been on the mailing list for the draft EIR.

further stated that he would direct DHS to act on the license application presently. On the same date, DHS finally certified the EIR (Guidelines, § 15090) and approved US Ecology's license—the decisions now under review.

## 2. *The Present Litigation.*

On October 15, 1993, one month following DHS's decisions, petitioners filed their petition for writ of mandate, under section 21168 and Code of Civil Procedure section 1094.5, naming DHS as respondent and US Ecology as real party in interest. Petitioners alleged that in certifying the EIR and issuing the license DHS had violated both CEQA and the RCL.[7] The petition alleged several deviations from CEQA, including failure adequately to assess the "waste stream" (types and amounts of waste to be disposed of), and failure to recirculate the EIR following receipt of new information of various types, including the proposed federal designation of tortoise habitat and the Wilshire memorandum. Under the RCL, petitioners claimed a number of procedural deficiencies, and alleged that several of DHS's findings, including that of US Ecology's qualifications, were unsupported.

On motion, the Forum was permitted to intervene. The court thereafter granted US Ecology's motion for summary adjudication (Code Civ. Proc., § 437c, subd. (f)) that, in conformity with *CalRad, supra,* 15 Cal.App.4th 841, an APA-type hearing had not been required for the license.

Before the hearing on the merits, two extrinsic events occurred. On February 8, 1994, the Department of the Interior published in the Federal Register its final designation of critical habitat for the desert tortoise, including the project site. Petitioner Committee requested that DHS prepare a supplemental or subsequent EIR for the project (§ 21166) in light of this designation, and petitioners requested the court take judicial notice of it. Over DHS's relevancy objection, the court did so.

Second, on December 2, 1993, the authors of the Wilshire memorandum issued a 39-page report (with appendices), restating and discussing the concerns set forth in that memorandum (the Wilshire Report). Although bearing the authors' USGS address, the report specifically stated that it represented only the authors' views, not those of any agency. The report explained that United States Senator Barbara Boxer had asked the authors in

---

[7]A parallel proceeding, commenced by the City of Needles, was heard together with this one but later settled.

September 1993 to respond to US Ecology's response to the Wilshire memorandum, and USGS had allowed them to respond as individuals. The report indeed was structured as a rebuttal to US Ecology's critique of the Wilshire memorandum. The Wilshire Report reiterated its authors' criticisms of the EIR, with particular regard to the three significant issues concerning groundwater infiltration and transport of wastes. It included further discussion of the basis for the authors' geological hypotheses, including an analysis of five theoretical "pathways" for groundwater from Ward Valley to the Colorado River.

Petitioners tendered the Wilshire Report to the trial court. DHS objected to its introduction on grounds it was not new evidence within the meaning of Code of Civil Procedure section 1094.5, subdivision (e), because it comprised not new facts but rather a recapitulation of the authors' opinions, previously expressed in the Wilshire memorandum, about facts already considered by DHS.[8] Alternatively, DHS offered a copy of its own, 22-page response to the Wilshire Report, which DHS had issued in January 1994. At the brief hearing on the merits, the trial court reserved ruling on the admissibility of the report.

After taking the matter under submission, the court filed an eight-page order stating its decision. The court admitted the Wilshire Report in evidence "for the limited purpose of evaluation on whether to remand the case," and also admitted DHS's response "for the same purpose." It then ruled that, notwithstanding that section 21168 provides that in CEQA cases ". . . the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record," resort to the independent judgment test was required with respect to petitioner Tribe, because of its "unique position and rights"—and hence with respect to the entire case.

The court proceeded to enumerate and reject many of petitioners' contentions, including the claim that the desert tortoise critical habitat designation required a subsequent EIR. It then turned to the Wilshire Report, observing that its subject matter (i.e., the possibility of pollution of the Colorado River)

---

[8]Code of Civil Procedure section 1094.5, subdivision (e) provides: "Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case."

was "an underlying concern" of petitioners' remaining contentions. The court stated, "The court agrees with petitioners' contentions on the limited grounds that the 'Wilshire' report is significant new scientific analysis. All other assertions within these contentions are without merit. For the reasons expressed below, this analytical data should be considered."

The court explained: "Although the outline of this significant new analysis is in the record [i.e., the Wilshire memorandum] and was presumably considered[, t]he full analysis presented by the report is extremely significant. . . . [¶] Even if the material in the Wilshire Report and response thereto is in the present administrative record in some form, it does not appear that the analysis therein has been placed in a proper perspective, so that an objective person can properly evaluate it . . . . The court does not doubt that an evaluative process has been applied to the Wilshire Report by [DHS] (see [DHS's January 1994 response]); however, the report should be evaluated in a pre-approval setting in order to give CEQA its full reign."[9]

Restating that "The analysis of the Wilshire Report should be placed side by side, in its complete form, with the counter analysis *before* any approval," the court concluded that in light of its rejection of petitioners' other arguments, "the remand will be for the limited purpose of reconsideration in light of the 'Wilshire Report.' Respondents are not required to have an entire renewal of the CEQA or licensing process unless it is necessary to give full exposure and evaluation to the Wilshire Report. The report is significant new 'analysis,' not data. It does not change the project, nor does its presence deprive the public of a meaningful opportunity to comment."

The court further opined that the Wilshire Report was not the type of material to call for a supplement or addendum to the EIR, as provided in Guidelines sections 15163 and 15164, but "is more likely the type to be considered as warranting a 'subsequent' EIR pursuant to [Guidelines] section 15162 and Public Resources Code section 21166." The court concluded: "Inasmuch as the court has determined the report to be evidence, which reasonably could not have been produced at the hearing (Code Civ. Proc.,

---

[9]At this point the court added, "The court also realizes that submission of the Wilshire Report at this state of the proceedings is highly unusual and an adequate explanation for the timing thereof has not yet presented. The determinative question obviously is why wasn't the report presented to respondents during the initial administrative process? Nevertheless, due to the overwhelming nature of the commitment involved in the project it behooves the court, and others, to allow the insertion of the report into the process. The added expense of remanding the issue to respondents for consideration of the Wilshire Report may be a cost of suit herein given the unusual timing of its submission. This question may be addressed if the added cost of remand becomes relevant in a later stage herein after final determination of the petition."

§ 1094.5 (e)), the court is remanding the case to respondents to be reconsidered in the light of the report's analysis. Whether a new hearing or recirculation [*sic*] of a 'subsequent' EIR is required or desirable is to be considered by respondents."

Petitioners proceeded to lodge a proposed judgment, incorporating much of the language of the order, and directing the issuance of a peremptory writ requiring DHS to set aside its approvals of the EIR and license and reconsider them in light of the Wilshire Report. DHS objected to the judgment, interpreting the court's order to require interlocutory remand and reconsideration, without a writ or vacation of DHS's decisions. The court overruled the objection and interpretation, and entered judgment granting the writ. (See Code Civ. Proc., § 1094.5, subds. (e), (f).) The writ directed DHS to set aside its approvals and reconsider the case in light of the Wilshire Report, "in a pre-approval setting."

DHS then moved for a new trial, on two grounds. First, it argued there had been insufficient basis for admission of the Wilshire Report under Code of Civil Procedure section 1094.5, subdivision (e) (see fn. 8, *ante*), and indeed that the court's order, characterizing the Wilshire Report as "new analysis, not data," established that. Second, DHS urged that denial of the writ was appropriate because DHS and its EIR consultant had now performed further analyses of the Wilshire Report—in reaction to the court's decisional order —which confirmed that the report did not require a subsequent EIR or other modifications. Concurrently, DHS filed a "response" to the court's original order, containing its consultant's voluminous analysis of the Wilshire Report and supplemental findings by DHS. US Ecology and the Forum noticed parallel motions.

The trial court denied all motions for new trial or modification of the judgment, specifically noting that DHS's "response" had not, by its terms, been filed as a return to the writ. These appeals followed.[10]

---

[10]The parties have presented contested requests for judicial notice of postrecord materials that largely reflect the treatment of the Wilshire Report in other forums, in connection with the pending federal land transfer. Principal among these matters are a National Academy of Sciences report that was requested by Secretary Babbitt, and press releases reflecting his and Governor Wilson's reactions to that study, which had generally endorsed the safety of the site but recommended additional tests and conditions to further assure it. Although these materials form part of the continuing, controversial process of this project, they are not legally relevant to the determination of these appeals. We therefore notice these matters only for the limited purpose of establishing, by way of background, that the events they comprise have occurred. We also notice the United States Supreme Court decision, California Attorney General's

RESPONDENTS' APPEALS

All three respondents contest the propriety of the trial court's judgment remanding the case to DHS for reconsideration in light of the Wilshire Report. In addition, US Ecology raises a preliminary issue as to the court's election of the "independent judgment" standard of review.[11]

1. *"Independent Judgment."*

■ US Ecology contends that the trial court should not have used the independent judgment test rather than the substantial evidence test in considering whether the evidence supported DHS's findings. (See Code Civ. Proc., § 1094.5, subd. (c).) At this stage, the issue is effectively academic. Although it afforded petitioners the stricter, weight-of-the-evidence review of the independent judgment test, the court ultimately decided all issues subject to that test adversely to petitioners. Were we to agree with the court's choice of the independent judgment test, the standard for our review of the court's determinations under it would be whether they are supported by substantial evidence found in the administrative record. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs 1 (The Rutter Group 1994) ¶ 8:128.1, p. 8-43.) On the other hand, if the court should have employed the alternative, substantial evidence test, its determinations would be subject to review by applying that same test, de novo, to the administrative record. (*Id.*, ¶ 8:128.2, p. 8-43.) The scope of review being effectively the same (see *id.*, ¶ 8:128, p. 8-43), it thus is difficult to see how US Ecology is presently aggrieved by the trial court's decision to apply the independent judgment test.[12]

Nevertheless, we briefly address the merits of the issue. The independent judgment test, as opposed to the substantial evidence test, applies when the administrative decision subject to review substantially affects a party's fundamental vested right. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143-144 [93 Cal.Rptr. 234, 481 P.2d 242].) Recognizing that none of the other petitioners

---

opinion, and South Carolina legislation separately tendered. Petitioners' motions to strike or to "disregard" portions of respondents' briefs are denied.

[11]DHS also seeks relief from the judgment's failure to allow it costs. That decision was made in a postjudgment order taxing costs, which is not the subject of either DHS's notice of appeal or its argument. We therefore do not address the issue.

[12]The matter would be different had the court, upon weighing the evidence, found any of DHS's findings unsupported. In that case, the court's choice of an improperly strict scope of review might well require reversal (unless we elected to review DHS's findings under the substantial evidence test in the first instance). Moreover, in such a case application of the substantial evidence test to the trial court's determination would be less favorable to respondents than de novo review for substantial evidence supporting DHS's findings.

could assert such rights as involved in DHS's decisions, the trial court nonetheless applied the independent judgment test based on what it termed the Tribe's "unique position and rights." The rights in question are the Tribe's long-established rights to water in and from the Colorado River. (See *Arizona* v. *California* (1963) 373 U.S. 546, 595-602 [10 L.Ed.2d 542, 575-579, 83 S.Ct. 1468].) These rights indeed are fundamental and vested. (See *id.* at pp. 598-600 [10 L.Ed.2d at pp. 576-578].) However, it cannot be said that they have been or will be substantially affected by the licensing of the project. DHS has not acted, directly or indirectly, to displace, abridge, or otherwise interfere with the Tribe's water rights. To contend otherwise involves total speculation about the long-term fate of the project, well beyond even the scientific skepticism of the Wilshire Report. Because DHS's decisions did not substantially affect the Tribe's fundamental vested rights, this case was not subject to the independent judgment test.[13]

### 2. *The Remand for Consideration of the Wilshire Report.*

The trial court's judgment granting the writ and remanding the case for reconsideration turned upon the Wilshire Report, which had been issued two and one-half months after DHS's decisions, and hence naturally was not a part of the voluminous administrative record. The court relied on Code of Civil Procedure section 1094.5, subdivision (e) (quoted *ante,* fn. 8), which accords the court in an administrative mandamus proceeding discretion to remand the case for reconsideration if the court finds "there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced" at the administrative hearing (or which was improperly excluded therefrom). ▮ We consider first respondents' preemptive contention that the statute's provision for remand in light of evidence outside the record does not contemplate or allow resort to evidence which, like the Wilshire Report, did not come into existence until after the administrative decision. Respondents rely on a recent decision of the Supreme Court that announced just that restriction with respect to extra-record evidence in quasi-legislative mandamus cases.

In *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*), the court held that evidence from outside the administrative record is generally not admissible

---

[13]We need not address US Ecology's further contention that that test was barred by section 21168, which facially precludes its employment in CEQA cases. Of course, this case also involved review of a decision under the RCL, which does not prohibit use of the independent judgment test. Nor do we address the Tribe's assertion that the presence of Ward Valley among their ancestral lands confers some fundamental vested right that the project will adversely affect. This argument was not made to the trial court.

in traditional mandamus cases reviewing quasi-legislative action, including those brought under CEQA. (Code Civ. Proc., § 1085; Pub. Resources Code, § 21168.5.) At issue was the admissibility of scientific, extra-record evidence in a proceeding challenging the promulgation of regulations. After reconfirming for CEQA cases the traditional quasi-legislative/quasi-judicial distinction between action subject to traditional and administrative mandamus remedies, the court first held that in the former type of cases review of the agency's decision for substantial evidence must be confined to evidence in the administrative record. This holding was based on the language of section 21168.5, traditional notions of judicial deference to legislative action, and the propriety of such deference to agency expertise as well. (*Western States, supra,* 9 Cal.4th at pp. 570-574.) Second, again stressing the deferential nature of judicial review of quasi-legislative action, the court held that dehors the record evidence also could not be used to show that the quasi-legislative agency had not proceeded in the manner required by law. (*Id.* at pp. 574-575.) Third, the court rejected two proposed exceptions to these rules, which would have allowed new evidence—there, conflicting scientific opinions—to be admitted to show that the agency had not considered "all relevant factors" or that the evidence on which it relied lacked substance to support its decision. (*Id.* at pp. 576-578.) The court characterized these proposals as "nothing more than a thinly veiled attempt to introduce conflicting expert testimony to question the wisdom and scientific accuracy of the [agency's] decision." (*Id.* at p. 578.)

However, the *Western States* court did acknowledge an exception for the admission of evidence "that could not be produced at the administrative level 'in the exercise of reasonable diligence' . . . ." (*Western States, supra,* 9 Cal.4th at p. 578.) Citing Code of Civil Procedure section 1094.5, subdivision (e), the court stated, "Extra-record evidence is admissible in administrative mandamus proceedings under such circumstances (Code Civ. Proc., § 1094.5, subd. (e)) and we see no reason to apply a different rule in traditional mandamus proceedings." (*Western States, supra,* at p. 578.) But the court further ruled that this exception could not be extended to expert testimony and reports prepared after the agency decision, under the premise that, not having existed then, they could not have been discovered with reasonable diligence. Such a range of admissibility, the court explained, "would seriously undermine the finality of quasi-legislative administrative decisions": a dissatisfied party could produce the report of "an expert who is

likewise dissatisfied," obtain a judicial remand, and thereafter repeat the same process. (*Ibid.*)[14]

The court concluded, "Therefore, although we agree that there is such an exception in traditional mandamus proceedings challenging quasi-legislative administrative decisions, this exception is to be very narrowly construed. Extra-record evidence is admissible under this exception only in those rare instances in which (1) the evidence in question existed *before* the agency made its decision, and (2) it was not possible in the exercise of reasonable diligence to present this evidence to the agency *before* the decision was made so that it could be considered and included in the administrative record." (*Western States, supra,* 9 Cal.4th at p. 578.) And although there might yet be further exceptions for extra-record evidence, "under unusual circumstances or for very limited purposes not presented in the case now before us" (*ibid.*), "extra-record evidence can never be admitted merely to contradict the evidence the administrative agency relied on in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision." (*Id.* at p. 579.)

Respondents contend that *Western States*' requirement that "the evidence in question existed *before* the agency made its decision" (*Western States, supra,* 9 Cal.4th at p. 578) must be read to apply not only to traditional mandamus proceedings involving quasi-legislative action, but also to the provisions of Code of Civil Procedure section 1094.5, subdivision (e), regarding administrative mandamus proceedings. Respondents base their argument on (1) the high court's statement, when expounding its limited exception to nonadmissibility, that "we see no reason to apply a different rule [than that provided by Code of Civil Procedure section 1094.5, subdivision (e)] in traditional mandamus proceedings," as well as (2) the court's explanation that to allow postdecision expert reports could lead to spiraling review and nonfinality of administrative decisions (*Western States, supra,* at

---

[14]We restate the court's language in context: ". . . WSPA goes on to contend that this exception would allow it to introduce *any and all* expert testimony and reports prepared *after* the ARB adopted the regulations. It apparently reasons that because this evidence did not exist when the ARB made its decision, it could not have been discovered 'in the exercise of reasonable diligence.' Such a broad reading of this exception would seriously undermine the finality of quasi-legislative administrative decisions. Any individual dissatisfied with a regulation could hire an expert who is likewise dissatisfied to prepare a report or give testimony explaining the grounds for his disagreement, introduce this evidence in a traditional mandamus proceeding, and, if he can persuade the court that the report raises a question regarding the wisdom of the regulation, obtain an order reopening the rulemaking proceedings. And if the administrative body were to adopt a regulation in the second proceeding that still was not to the individual's satisfaction, he could simply repeat the process." (*Western States, supra,* 9 Cal.4th at p. 578.)

p. 578)—a prospect respondents suggest the trial court's decision regarding the Wilshire Report portends.

These points are not without appeal. But ultimately, we cannot construe *Western States* as fixing the meaning of Code of Civil Procedure section 1094.5, subdivision (e) as well as the common law relating to traditional mandamus brought to review quasi-legislative action. From beginning to end *Western States* was concerned with the latter type of proceedings. In rendering the very holding on which respondents rely, the court once again expressly addressed such proceedings.[15] Moreover, had the court also intended to construe and qualify Code of Civil Procedure section 1094, subdivision (e)—a construction that would have been obiter dictum—it presumably would have been conscious that its interpretation conflicted with a substantial line of Court of Appeal decisions approving the use, under that subdivision, of evidence that did not exist when the administrative decision was rendered. (E.g., *Elizabeth D.* v. *Zolin* (1993) 21 Cal.App.4th 347, 356 [25 Cal.Rptr.2d 852]; *Toyota of Visalia, Inc.* v. *New Motor Vehicle Bd.* (1987) 188 Cal.App.3d 872, 881-882 [233 Cal.Rptr. 708]; *Curtis* v. *Board of Retirement* (1986) 177 Cal.App.3d 293, 298-299 [223 Cal.Rptr. 123]; *Windigo Mills* v. *Unemployment Ins. Appeals Bd.* (1979) 92 Cal.App.3d 586, 594-597 [155 Cal.Rptr. 63].) The *Western States* court had no difficulty disapproving numerous Court of Appeal cases that had postulated a more generous rule of admissibility of extra-record evidence in quasi-legislative mandamus than the court was approving. (*Western States, supra,* 9 Cal.4th at pp. 570, fn. 2, 576, fn. 6.) Had the court intended to overrule the cases interpreting Code of Civil Procedure section 1094.5, subdivision (e) too, it surely would have done so explicitly. We therefore are unable to conclude that *Western States* prohibits the use, under Code of Civil Procedure section 1094.5, subdivision (e), of evidence which did not come into existence until after the administrative hearing or decision.

██   But even if remand in light of such evidence is not prohibited under Code of Civil Procedure section 1094.5, subdivision (e), we agree with respondents that the concerns that underlay *Western States'* barring post-decision evidence in quasi-legislative mandamus cases also bear on the proper application of that statute, in administrative mandamus cases. In such cases too, the writ is also made available to "inquir[e] into the validity of [a] final administrative decision," rendered on the basis of "evidence taken" (Code Civ. Proc., § 1094.5, subd. (a)), that is, evidence in the administrative

---

[15]"Therefore, although we agree that there is *such an exception in traditional mandamus proceedings challenging quasi-legislative administrative decisions, this exception* is to be very narrowly construed." (*Western States, supra,* 9 Cal.4th at p. 578, italics added.)

record. Subdivision (e) opens a narrow, discretionary window for additional evidence, newly discovered after the hearing (or improperly excluded at it). Routine allowance thereunder of conflicting scientific opinions created after the decision would pose for quasi-judicial decisions at least as great a threat of repeated rounds of litigation, and uncertain, attenuated finality, as it would for quasi-legislative actions, as observed in *Western States, supra,* 9 Cal.4th at page 578 (fn. 14, *ante*).

Remand under Code of Civil Procedure section 1094.5, subdivision (e) for consideration of postdecision evidence generally has been limited to truly new evidence, of emergent facts. The leading case endorsing the use of newly created evidence under the statute adverted to mandamus's traditional function of achieving justice, and then concluded that by the enactment of subdivision (e), ". . . it reasonably may be inferred that [the Legislature] meant to authorize the receipt of evidence of events which took place after the administrative hearing." (*Windigo Mills* v. *Unemployment Ins. Appeals Bd., supra,* 92 Cal.App.3d at pp. 596-597.) Subsequent cases, following *Windigo Mills,* generally have involved that type of newly developed evidence. Thus, in *Elizabeth D.* v. *Zolin, supra,* 21 Cal.App.4th at page 356, the court granted the trial court discretion to admit a doctor's report of the petitioner's posthearing medical condition, for determination of whether her condition justified the suspension of her driver's license. Similarly, in *Curtis* v. *Board of Retirement, supra,* 177 Cal.App.3d at pages 298-299, the court ordered remand of a disability retirement case for consideration of new medical reports of the petitioner's condition following the administrative hearing. And in *Toyota of Visalia, Inc.* v. *New Motor Vehicle Bd., supra,* 188 Cal.App.3d at page 882, the court approved the admission of evidence of the petitioner's posthearing restitution to defrauded customers, as relevant to the issue of mitigation in a second penalty hearing. (See also *Department of Parks & Recreation* v. *State Personnel Bd.* (1991) 233 Cal.App.3d 813, 836-838 [284 Cal.Rptr. 839], in which the court, while holding certain postdecision evidence relevant and admissible, further held that the trial court had not abused its discretion in declining to remand for reconsideration in light of that evidence.)

The trial court's present decision to require DHS to reconsider its decision in light of the Wilshire Report differs markedly from these traditional invocations of Code of Civil Procedure section 1094.5, subdivision (e). To begin with, the administrative proceeding here was not a conventional disciplinary or entitlement decision; it was a wide-ranging scientific inquiry not unlike the proceedings at issue in *Western States, supra,* 9 Cal.4th 559. As analyzed by the Third District, DHS's role was "hardly a

classic quasi-judicial function. . . . In the implementation of this project some of [DHS's] functions are in fact quasi-judicial, but in other respects, such as site selection and regulation, [DHS] is exercising executive and quasi-legislative functions." (*CalRad, supra,* 15 Cal.App.4th at p. 862.)

Second, other than its publication the Wilshire Report did not truly constitute "evidence of events which took place after the administrative [decision]." (*Windigo Mills* v. *Unemployment Ins. Appeals Bd., supra,* 92 Cal.App.3d at p. 597.) The report was a restatement and elaboration of its authors' opinions about possible features of the site which they had previously discussed in the Wilshire memorandum, and which, along with that memorandum, DHS had already taken into account. The Wilshire Report was highly cumulative, in light of, among other things, its own "outline" in the Wilshire memorandum (as the trial court put it). (See *ante,* p. 1588.) In context, requiring renewed reconsideration of DHS's decisions in light of the authors' renewed exposition of their opinions bore the earmarks of a revolving rehearing, certain to undermine the prospect of a final decision of this matter so long as scientists are able to advance conflicting views.

■ As noted above, the trial court yet opined that the Wilshire Report constituted the type of new information that would call for a supplemental EIR, under section 21166 and Guidelines section 15162. Similarly, petitioners had cited the Wilshire memorandum below chiefly in urging that it had required either such a supplemental EIR or recirculation of the original EIR, under section 21092.1 and Guidelines section 15088.5. But in truth, neither the Wilshire Report nor the Wilshire memorandum warranted any such further action under CEQA.

As here relevant, section 21166 allows for the preparation of a subsequent or supplemental EIR, after the original one, if "[n]ew information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available." (§ 21166, subd. (c).) Guidelines section 15162 elaborates that the "new information" requiring such a further EIR must be "of substantial importance"; that it "was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified"; and that it show one of the following: "(A) The project will have one or more significant effects not discussed in the previous EIR . . . ; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be

feasible and would substantially reduce one or more significant effects of the project, but [its] proponents decline to adopt [them]; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt [them]." (Guidelines, § 15162, subd. (a)(3).) Similar qualifications attend the requirement that an EIR be recirculated, "[w]hen significant new information is added" before its certification. (§ 21092.1; see *Laurel Heights II*, *supra*, 6 Cal.4th at pp. 1126-1132; Guidelines, § 15088.5, subd. (a) [significant new environmental impact, substantial increase in the severity of one already identified, or feasible and different mitigation measure not previously analyzed].)

The Wilshire Report, and for that matter the Wilshire memorandum, did not meet these criteria. Preliminarily, the Wilshire Report arrived too late to require a supplemental EIR for the project approval here at issue, which had already occurred. Once such an approval has been given, CEQA's role in it is completed. If qualified new information thereafter develops, a supplemental or subsequent EIR must be prepared in connection with the next discretionary approval, if any. But information appearing after an approval does not require reopening of that approval. (Guidelines, § 15162, subd. (c); Kosta & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1995) § 19.28, pp. 732-733.)

Apart from its untimeliness under CEQA, the Wilshire Report, as well as the Wilshire memorandum, did not show any new or more severe environmental impact of the project (or any newly feasible mitigation measure). DHS and US Ecology had already studied and addressed the risks of transport of escaped wastes to the groundwater, as well as the dependent concern of their transit to the Colorado River. The two Wilshire papers constituted further analyses of those issues, critiquing the (draft) EIR's own analysis. The memorandum and report thus provided only another point of view. Even the Wilshire Report's extensive discussion of possible groundwater pathways from Ward Valley to the river was theoretical, not a report of newly found realities. In sum, the Wilshire Report and memorandum did not qualify as the type of information about environmental impacts or their mitigation that requires reopening a completed EIR under CEQA. (Cf. *A Local & Regional Monitor* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1800-1803 [16 Cal.Rptr.2d 358] [supplemental EIR not required by subsequent analysis of factors already analyzed in EIR].)

The trial court itself acknowledged concerns about its action, in view of the content and timing of the Wilshire Report. The court recognized that the

report's points, and indeed their expression in the Wilshire memorandum, appeared in the administrative record and had already undergone analysis before DHS rendered its decisions. Moreover, as quoted above (fn. 9, *ante*), the court was troubled over the report's late interjection in the proceedings—to the extent that it included in its judgment a likely unprecedented reservation of whether to assess the costs of the remand as costs of suit.[16] Nonetheless, the court did proceed to order remand, insisting that the Wilshire Report be examined by DHS "in a pre-approval setting."

In light of the factors discussed above, we believe that decision was inappropriate. In the court's own words, the Wilshire Report at best was "new 'analysis,' not data." In the form of the Wilshire memorandum, it had already been considered by DHS. In effect, both documents were untimely comments on the EIR. Neither qualified, under CEQA, to require a further EIR. Moreover, DHS also had considered and responded to the Wilshire Report itself, even though the licensing decision already had occurred. Particularly after DHS provided an even more extensive analysis of the report in response to the court's tentative decision, remand to require such consideration be conducted yet again, in a physically "pre-approval setting," exceeded the court's proper discretion under Code of Civil Procedure section 1094.5, subdivision (e). Insofar as it requires such remand and reconsideration, the judgment must be reversed.

## PETITIONERS' APPEAL

In their own appeal from the judgment, petitioners assert a number of alleged violations of CEQA and the RCL, rejected by the trial court, which they contend warranted broader relief than the limited remand the court ordered. In addition, petitioners advance a further set of claims under CEQA which they assert the trial court accepted, and which petitioners therefore present as constituting grounds for sustaining the judgment. Petitioners misconstrue: the court did not substantively embrace or adopt any of these contentions, except insofar as it discerned the Wilshire Report to merit remand and reconsideration under Code of Civil Procedure section 1094.5,

---

[16]With respect to its timing, respondents contend that the Wilshire Report failed to satisfy the precondition of Code of Civil Procedure section 1094.5, subdivision (e) that it could not have been produced in the administrative proceeding in the exercise of reasonable diligence. Absent a showing that petitioners were involved in the report's preparation and completion, the fact that the report was issued two and one-half months after DHS's decisions fulfilled this qualification.

subdivision (e).[17] However, in the interests of substance, we will treat petitioners' arguments about these issues as assignments of error, along with the contentions that are properly so labeled. (In fact, one of the former effectively duplicates one of the latter.)

■ With respect to all of petitioners' contentions, the ultimate question is "whether there was any prejudicial abuse of discretion" (Code Civ. Proc., § 1094.5, subd. (b)), "abuse of discretion" meaning that DHS did not "procee[d] in the manner required by law" (*ibid.*) or, where asserted, that its "findings are not supported by the evidence," that is, substantial evidence. (*Ibid.*; see § 21168.)

### 1. *Inadequately Descriptive and Informative EIR.*

■ Petitioners contend that the EIR failed its informative and instructive assignment (see *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]) in several respects, primarily because it inadequately and inaccurately described the project with regard to its "waste stream," i.e., the types and quantities of radioactive matter that would be placed in the repository during the 30 years it would be open to receive LLRW. (See *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 197-200 [139 Cal.Rptr. 396].) Throughout the licensing and EIR process, DHS and US Ecology reviewed and documented the projected receipts of the facility, by reference to the known and anticipated types of sources, or "generators," of LLRW in the multistate compact region, and the projected quantities of waste they would provide. Petitioners fault the EIR's accuracy and completeness in several respects, concurrently alleging violation of the RCL's informative requirements.

With reference to plutonium-239 (Pu-239), a very long-lived radioactive substance, petitioners note that tables in the draft and final EIR's listed about 0.45 curies projected for deposit (out of facility capacity of 5,200,000 curies), but that other tables, in the license application, reflected about 3,500 curies. This discrepancy derived from inclusion or exclusion of Pu-239 that could come from decontamination or decommissioning of nuclear power plants. Because those activities were prospective and uncertain, respondents derived figures for them from a "generic" analysis by the United States Nuclear Regulatory Commission, but excluded those results from some of the tables.

---

[17]The ruling below stated, "The court agrees with petitioners' contentions on the limited grounds that the 'Wilshire report' is significant new scientific analysis. *All other assertions within these contentions are without merit.*" (Italics added.)

Petitioners' suggestion that these reporting differences somehow changed the project is thus exaggerated. Petitioners further contend, however, that the facts and tables explaining the Pu-239 situation were not made available to the public along with the rest of the EIR into which they were incorporated only by reference. The record before us, however, dramatically blunts this contention. In March 1992, petitioner Committee released an extensive, critical report regarding the project. That report itself contained one of the tables from the license application which showed the higher amount of Pu-239 (3,507.8 curies).

Petitioners allege another change in the project with respect to its waste stream. Petitioners observe that in September 1991—"after the public comment period on the [f]inal EI[R] ended, but over two years before [its] certification"—a pharmaceutical company that had intended to dispose of about 4,000,000 curies of tritium over 30 years announced that it was reducing that projection to between 500,000 and 1,100,000 curies. From this petitioners speculate that reduction of the amount of tritium, a short-lived radioactive substance, will permit or cause the project to receive far greater amounts of potentially more toxic LLRW. But such speculation does not establish a change of the project or a deficiency in its EIR.

■ Petitioners contend that the EIR was deficient because it failed to analyze the possibility of groundwater connection between Ward Valley and the Colorado River, in the manner postulated by the Wilshire Report. DHS determined that such connections, and the possibility of adverse environmental effects therefrom, were untenable, a conclusion that DHS reexamined once the Wilshire memorandum broached the subject again. Petitioners' contention rests on a difference of opinion among experts, and does not provide grounds for rejecting the EIR. (See *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392-393 [253 Cal.Rptr. 426, 764 P.2d 278].)[18]

■ Petitioners assert error in DHS's failure to publicly distribute not the EIR itself, or the license application that was incorporated by reference into it, but various other documents that in turn were incorporated by reference into the license application. Petitioners also challenge the EIR's failure specifically to summarize some such documents. For two reasons, this complaint is insubstantial. First, the license application itself was a generally accessible matter of public record, as CEQA requires for documents incorporated by reference into an EIR. (§ 21060; Guidelines, § 15150.) Second,

_____

[18]A like conclusion obtains with respect to petitioners' discussion of vertical water migration analysis (which appears to have been raised only in the reply brief).

even assuming DHS fell short of its obligations with respect to release of certain subsidiary license documents, petitioners have failed to demonstrate that such an error was prejudicial. (See Pub. Resources Code, § 21005; Code Civ. Proc., § 1094.5, subd. (b); *Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 749 [22 Cal.Rptr.2d 618]; cf. *Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 742 [12 Cal.Rptr.2d 785], disapproved on another point in *Western States*, *supra*, 9 Cal.4th at p. 576, fn. 6.)

Petitioners also assert that the ultimate release of some of the doubly incorporated material required a supplemental EIR, under section 21166. This contention is blunderbuss and nonspecific. It does not begin to establish error under the tests set forth in section 21166, Guidelines section 15162, and *Laurel Heights II*, *supra*, 6 Cal.4th 1112.

■ Finally, petitioners contend that DHS violated CEQA by certifying the EIR before conduct of the hearings that Secretary Babbitt requested of Governor Wilson. Petitioners rely on the unexceptionable proposition that the environmental review of which the EIR is the centerpiece must be conducted before project approval is given. But there was no violation of that rule. The EIR covered the relevant issues, and DHS considered them, before certification and approval. The impending further hearing is an ad hoc requirement by the Secretary for his approval of site transfer; it was neither required by, nor a precondition to, DHS's approval under CEQA.

### 2. *US Ecology's Safety Qualifications.*

Pursuant to governing regulations (10 C.F.R. § 61.23(a) (1995), incorporated by reference in Cal. Code Regs., tit. 17, § 30470), DHS was required to and did find, in licensing US Ecology, that it was qualified by training and experience to conduct the LLRW disposal activities "in a manner that protects health and minimizes danger to life or property." DHS made this finding based on a record that reflected US Ecology's combined experience in operating four of the six LLRW facilities previously operative in the United States, as well as a wide-ranging review of US Ecology's present capabilities and intentions with respect to assurance of public health and safety.

■ Here as below, petitioners challenge DHS's suitability finding as not supported by substantial evidence. Petitioners rely on a variety of regulatory complaints or incidents respecting the other US Ecology facilities, as well as a negative initial assessment of US Ecology by DHS's staff when, early in the selection process, US Ecology was ranked last out of four applicants. (The others later dropped out for financial reasons.) Petitioners

note that three of US Ecology's four prior facilities have been closed for various reasons, one of them (in Kentucky) becoming a Superfund cleanup site.

US Ecology's record does not appear perfect, but neither is the record as one-sided as petitioners would have it. When it was ranked fourth, US Ecology also was found qualified, and DHS's rankings apparently depended heavily on financial and "concept" qualifications. (See Cal. Code. Regs, tit. 17, § 30479.) The Kentucky facility was an old one, licensed and constructed before promulgation of federal regulations that now control, and situated in a greatly different physical environment from the arid Ward Valley. The record reflects that Kentucky officials credited US Ecology with adhering to what were considered proper practices at the time. DHS was apprised of and took into account all of US Ecology's record, the bad and the good alike. There is certainly substantial evidence of the latter. As the trial court found, DHS's finding is legally supported.

### 3. *Governmental Landowner Assurances.*

Sections 61.14 and 61.63 of 10 Code of Federal Regulations (1995) require applicants for LLRW disposal licenses to provide certain assurances that the federal or state government that owns the site (ownership being limited to such governments by 10 C.F.R. § 61.7(c)) will assume responsibility for maintenance of the facility following its closure, generally 30 years after opening. Under section 61.14(a), the applicant must provide a certificate from the landowner government that it is prepared to accept transfer of the license upon closure, and will assume responsibility for maintenance and care of the facility thereafter. Section 61.63(a) further requires the applicant to provide "a binding arrangement, such as a lease," with the site owner which assures that sufficient funds will be available for monitoring and maintenance during the postclosure period. In response to these requirements, US Ecology obtained and provided a certification from DHS of the matters under section 61.14(a), and a lease from the state which provided for collection of sufficient waste disposal surcharges to pay the costs of post-closure monitoring and maintenance. (See also Health & Saf. Code, § 25878, art. 4, subd. (E)(3) [requiring the state to ensure that disposal charges are sufficient to cover, inter alia, long-term care of the facility].)

Petitioners contend that this documentation was insufficient under the regulations, and hence the license was invalidly issued, because the federal not the state government was and is the site owner of Ward Valley, and the state could not validly lease land it did not yet own. The contention

is one of form not substance. Both the lease and the license are specifically contingent upon the federal government's transferring the land to the state. But California's undertakings explicitly satisfy the regulations' requirements of landowner assurances regarding prospective control and custody. Moreover, whatever its title or contingencies, the lease agreement between the state and US Ecology is "a binding arrangement" with respect to the obligations in question. (10 C.F.R. § 61.63(a) (1995).) To argue, as petitioners do, that US Ecology should instead have obtained these commitments from the federal government is to indulge a reading that petitioners assuredly would be challenging as fatally unrealistic had it actually been pursued.

### 4. *Desert Tortoise Habitat Impacts.*

Petitioners assert several contentions regarding DHS's and the EIR's treatment of the desert tortoise's habitat. We first review the regulatory background. As previously noted, during the pendency of this case an area that includes the project site was officially designated by the U.S. Fish and Wildlife Service (service) as critical habitat for the tortoise, under the federal Endangered Species Act (16 U.S.C. § 1531 et seq. (federal act)). (The designation encompassed over 6,600,000 acres, 4,750,000 in California, including the approximately 90-acre LLRW disposal site.) During much of the previous EIR and licensing process, DHS explored the predictable and potential impacts of the project on the tortoise population. Ward Valley had been termed a "crucial habitat" for the tortoise by the BLM, and in 1989, the year before its designation as a "threatened species" under the federal act, the tortoise became similarly listed by the state Department of Fish and Game (department), under the California Endangered Species Act. (Fish & G. Code, § 2050 et seq.; see *id.*, § 2070.)

This state listing legally engendered consultation between DHS and the department regarding impacts on the tortoise (§ 21104.2), to the end of protecting "the continued existence of" the species. (Fish & G. Code, § 2090, subd. (a).) The department also consulted with federal authorities, under Fish and Game Code section 2095, and, as there provided, the department ultimately adopted the federal biological opinion (16 U.S.C. § 1536(c)), prepared on account of the land transfer process. That opinion took into account mitigation measures proposed and ultimately adopted by DHS during the EIR process. They included relocation of some animals, and fencing the nearby interstate highway, both to avoid mortalities and to encourage interaction. The federal, state-adopted biological opinion made positive findings concerning the project's prospective impact on the tortoise,

with reference to both its continued existence and the habitat essential to that existence. (See Fish & G. Code, § 2090.)[19]

In its final decisions, which imposed these mitigation measures, DHS stated that its findings that those measures would reduce the project's impacts on the species to insignificant levels were unaffected by the federal proposal for critical habitat designation, which had been issued two weeks earlier, because DHS's analysis and findings had already taken into account the project's ouster of ninety acres of "high quality desert tortoise habitat."

Petitioners assign several defects in DHS's treatment of tortoise habitat questions. First, they contend that DHS violated its own site-selection criteria by choosing a critical habitat area. Respondents rejoin that the criteria were precatory, and concerned only endangered, not threatened, species. Two further points are dispositive. First, the criteria cited by petitioners referred to land prohibited by law from LLRW disposal use, which no one contends the Ward Valley site was. Second, in any event, the site was chosen years before it became a federally designated critical habitat.

Petitioners next assert inadequacy in the EIR's discussion of "cumulative impacts" upon the tortoise, that is, the impact of this project taken in light of and together with the impacts of other projects and environmental factors. (See Guidelines, § 15355.) Seizing upon a sentence in the EIR that "[t]he proposed project would contribute impacts to far less than 1% of the area examined, and is not a significant cumulative impact," petitioners contend that the EIR adopted and pursued the isolated-focus approach to cumulative impacts that was condemned as inconsonant with the Guidelines in *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 718-721 [270 Cal.Rptr. 650]. We disagree. The EIR plainly explained how the tortoise population in the project region had been the most free of impacts, whereas other sectors of the species had experienced degrees of degradation from various human and natural causes, and concluded that it would be "very important . . . to maintain or increase the viability of the [particular] population." To that end, the EIR proceeded to propose mitigation measures which DHS adopted. The EIR's discussion of cumulative impacts was legally sufficient.

Petitioners' further contentions relate to the federal designation of critical habitat. Petitioners contend that the proposed designation, of August 1993,

---

[19]Like the EIR, the biological opinion focused directly on the practical habitat question. Its "Analysis of Impacts" began by stating, "The proposed action will result in the removal of approximately 78 acres of desert tortoise habitat for a minimum of 35 years. . . . [T]he loss of this habitat should affect approximately 18 to 20 tortoises."

and the final designation, of February 1994, constituted new circumstances requiring DHS to recirculate the EIR for further comment under section 21092.1, or to prepare a supplemental EIR under section 21166. Petitioners deem these circumstances heightened by the fact that the ultimate habitat designation will require another biological opinion under the federal act.

For several reasons, these contentions lack merit. First, as previously discussed in connection with the Wilshire Report, the final designation of 1994, which followed DHS's approval of the license, came too late to require a supplemental EIR, at least in connection with that approval. (See Guidelines, § 15162, subd. (c).) However, petitioners assert that the preliminary designation also amounted to either "Significant new information" requiring recirculation (§ 21092.1) or a supplemental EIR (§ 21166, subd. (c)), or "Substantial changes . . . with respect to the circumstances under which the project is being undertaken," also requiring a supplemental EIR (§ 21166, subd. (b)). Once more, all of these qualifications require the presence of significant new or enhanced environmental effects, for which the original EIR must be supplemented to assure adequate comment and coverage. (Guidelines, §§ 15088.5, subd. (a), 15162, subds. (a)(2), (3); *Laurel Heights II, supra,* 6 Cal.4th at pp. 1129-1132.)

The advent of the critical habitat designation did not trigger these elements. No changes were made or discovered in the project or its physical, environmental effects; the "new information" was an already anticipated recharacterization of the site's status under the federal act. (Accord, *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1550-1552 [252 Cal.Rptr. 79] [expansion of wilderness park to surround project did not require supplemental EIR because actual impacts had already been considered; "No new protected or rare habitat or species of flora or fauna were discovered or found to be impacted that had not been discovered when the EIR was prepared." (*Id.* at p. 1550, fn. omitted.)]; compare *Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357 [212 Cal.Rptr. 127] [discovery of previously unknown project encroachment on wetlands four days before certification required supplemental EIR].) That is why DHS found that the proposed designation did not change its prior findings: however legally characterized, the habitat would be affected the same as before. And the environmental review and mitigation measures that had already been completed focused on the real effects of the project not just on "the tortoise," but on its habitat (previously termed "crucial"), which is exactly how the project would impact on the species.

Petitioners' view is that the EIR should have been redone because of a change not in physical circumstances but in impending federal legal and scientific review. That is, given the critical habitat designation, before the federal government transfers the site the service will have to prepare another biological opinion under the federal act, focusing not simply on the survival of the species directly, but now indirectly, on effects on the habitat and on prospects for species "recovery."[20] What the practical difference will be remains to be seen. But whatever the significance of that inquiry under federal law and for the federal decision about this project, its impendency does not amount to the type of new or changed circumstances requiring supplementation or recirculation of the present EIR, which already has served the practical and informational functions of CEQA with respect to this project's impact on the tortoise and its habitat.

### 5. Petitioners' Rights to Participate.

Petitioners Tribe and Committee contend that DHS abridged or denied their rights to participate in the licensing process, as provided for by two sources, Health and Safety Code section 25845, subdivision (a), and 10 Code of Federal Regulations sections 61.70-61.73 (1995). We consider these provisions in turn.

Health and Safety Code section 25845, subdivision (a) provides that "In any proceeding under this chapter for granting or amending any license, . . . [DHS] shall afford an opportunity for a hearing on the record upon the request of any person whose interest may be affected by the proceeding, and shall admit that person as a party to such proceeding." The Committee made such a request, received party status, and participated in the license hearings. It complains, however, that its party status should have included the right to speak at greater length than other interested public participants, and to enjoy the same involvement in the overall process as, for example, US Ecology. We see no authority for these contentions.

The Tribe did not receive party status, because it did not specifically request it. The Tribe yet was allowed to participate. Nothing in the federal regulations granted the Tribe automatic party status under Health and Safety Code section 25845, subdivision (a). These regulations, as applicable to DHS here, allow for a tribal government's submission of, and the adoption of, a proposal for how it will participate in license application review. (10 C.F.R. §§ 61.70, 61.72, 61.73 (1995).) The Tribe does not contend that it submitted any such proposal. The Tribe did make its opposition to the

---

[20]Petitioners assert that a new state biological opinion also must be prepared. Petitioners do not establish that there is such a requirement, but if there were it presumably would mean the department's again adopting the federal opinion. (See Fish & G. Code, § 2095.)

project known to DHS, and DHS met with Tribe representatives and explained the environmental and license review process before any hearings were held. (See *id.*, § 61.71.)

The trial court correctly found that petitioners failed to establish an abridgment of their rights to participate in the proceedings.

### 6. *Adoption of Hearing Procedures.*

In 1991, DHS announced procedures for the conduct of the second public hearing on the license application, held that year. Health and Safety Code section 25845, subdivision (c) provides that "adoption, repeal, or amendment of rules and regulations pursuant to [the RCL] shall be accomplished in conformity with" the APA's provisions regarding regulations (Gov. Code, § 11340 et seq.). (Accord, Health & Saf. Code, § 25803.) Petitioners contend that DHS was bound to follow the APA in adopting its 1991 hearing procedure, and its failure to do so voids the license approval.

The contention lacks merit. The hearing procedure, self-described at one point as a "handout" for hearing participants, comprised information and instructions regarding this one hearing. It was not a "rule, regulation, order, or standard *of general application,*" the definition of " '[r]egulation' " as covered by the APA. (Gov. Code, § 11342, subd. (g), italics added; see *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 322-324 [253 P.2d 659].)[21]

### 7. *Requisite Hearing Procedures.*

Petitioners' final contentions concern alleged failures by DHS to comply with legal requirements in connection with the public hearings it conducted concerning the license application and approval. Petitioners raise three issues regarding the 1990 hearings and one with respect to the licensing hearings as a whole.

The hearing officer at one of the 1990 hearings announced that "the California Code of Regulations requires that [DHS] issue an *Analysis of Public Comments* received during the public hearing," which would briefly respond to comments at the hearing and specify which provisions of the license application (if any) had been changed as a result. This document, he continued, would be sent to hearing participants and public repositories. Petitioners assert that no such document was distributed. Assuming this is so, neither can we discern any provision requiring such an "analysis," in

---

[21]Also meritless is petitioners' augmented contention, in their reply brief, that Health and Safety Code sections 25803 and 25845, subdivision (c) mandated DHS to adopt APA-type regulations for the hearing. The statutes simply do not so provide.

either the California Code of Regulations or any other code. Petitioners do not cite any.

Petitioners' second contention is that the 1990 public hearing was not properly publicly noticed. But again, petitioners provide neither legal authority nor factual support for this contention. Equally indefinite in legal basis or factual specificity is petitioners' third contention, that the hearing was tainted because DHS withheld portions of the license application from public view. Of course, a similar issue regarding the public disclosure requirements of CEQA has already been discussed (pt. 1, *ante*).

Finally, petitioners reassert their claim, which was summarily adjudicated adversely below, that the hearing provided for by Health and Safety Code section 25845, subdivision (a) must be a formal, APA-type, adjudicatory one. This question was extensively treated and negatively answered by the Third Appellate District in *CalRad, supra,* 15 Cal.App.4th 841. We decline petitioners' request to depart from that thorough and persuasive decision of the issue.

Alternatively, petitioners pose, as allegedly unanswered by *CalRad,* a series of open-ended questions about what type of hearing was required, if not a formal adjudicatory one. Petitioners do not purport to supply any answers, which is reason enough to dismiss these interrogatories. Moreover, *CalRad* has already answered them. After reviewing a wide range of state and federal law, the court there concluded: "By declining to require formal APA-type hearings in Health and Safety Code section 25845, subdivision (a), the Legislature necessarily left the character of the hearings and the procedures which would be applicable to the discretion of [DHS]." (*CalRad, supra,* 15 Cal.App.4th at p. 871; see *id.* at p. 876.)

## DISPOSITION

The judgment is reversed, with directions to enter judgment denying the petition for writ of mandate. The parties shall bear their own costs on appeal.

Boren, P. J., and Brandlin, J.,* concurred.

A petition for a rehearing was denied November 3, 1995, and the petition of plaintiffs and appellants for review by the Supreme Court was denied January 18, 1996. Mosk, J., and Baxter, J., were of the opinion that the petition should be granted.

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.