Filed 12/18/14  Santa Clarita Org. for Planning etc. v. City of Santa Clarita CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SANTA CLARITA ORGANIZATION FOR PLANNING AND THE ENVIRONMENT et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SANTA CLARITA et al., <br><br> Defendants and Appellants; <br><br> VISTA CANYON RANCH, LLC, <br><br> Real Party in Interest and Appellant. | B250487 <br><br> (Los Angeles County Super. Ct. No. BS132487) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Allan J. Goodman, Judge.  Reversed.

Dean Wallraff for Plaintiffs and Appellants.

Joseph M. Montes, City Attorney, City of Santa Clarita; Burke, Williams & Sorensen, Brian A. Pierik and Amy E. Hoyt for Defendants and Appellants.

Gatzke Dillon & Balance, Mark J. Dillon, Danielle K. Morone; Morrison & Foerster and Mariam A. Vogel for Real Party in Interest and Appellant.

_____

## INTRODUCTION

This appeal and cross-appeal are from a writ of mandate involving the Vista Canyon Project, a proposed mixed real estate development in the City of Santa Clarita (the Project). The appellants are: the developer, Vista Canyon Ranch, LLC (Vista); the City of Santa Clarita (City); and the Santa Clarita City Council (Council). Collectively, we will refer to these parties as the "City," even though some of the events may refer only to the City of Santa Clarita. The respondents are three community groups opposed to the Project: the Santa Clarita Organization for Planning and the Environment (SCOPE), Friends of the Santa Clara River and Homeowners of Neighborhood Preservation. Collectively, we will refer to these parties as "SCOPE."

The Project's 185-acre site, located in an unincorporated portion of Los Angeles County adjacent to the City of Santa Clarita, is owned by Vista, except for 43 acres along the Santa Clara River corridor which are owned by the City of Santa Clarita. The Project includes sale of four of the City-owned acres to Vista and annexation of the entire site to the City of Santa Clarita. The stretch of the Santa Clara River (the River) which runs through the site is dry except in periods of heavy rainfall.

Following a four year review process, the Council approved the Project over SCOPE's objection that the revised Final Environmental Impact Report (EIR) did not comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] As approved, the Project preserves a "revised River corridor" (River Corridor) averaging over 800 feet in width, amends the City's General Plan to recognize the River Corridor as a "Significant Ecological Area" (SEA), and provides for Vista to dedicate all of the River Corridor property it owns back to the City upon Project completion. SCOPE brought a petition for writ of mandate to set aside the Council's certification of the EIR and approval of the Project. The trial court granted the writ

---

[1] All undesignated statutory references are to the Public Resources Code. All references to "Guidelines" are to the administrative regulations implementing CEQA, which are found in title 14, section 15000 et seq. of the California Code of Regulations. (See § 21083 [authorizing the Secretary of the State Resources Agency to adopt guidelines].) Under CEQA, the City is a "public agency." (§ 21063.)

petition finding that the EIR (1) inadequately incorporated documents by reference as required by the Guidelines and (2) inadequately analyzed the Project's potential effect on the River.  The trial court rejected SCOPE's other challenges to the EIR.

The appeal challenges the trial court's findings.  In the cross-appeal, SCOPE contends:  (1) the Project is inconsistent with the City's General Plan, adopted in 2011; (2) the EIR did not adequately analyze the adverse effects of the Project on chloride pollution in the River; and (3) it was error to sustain the City's demurrer to the third cause of action without leave to amend.

We reverse.

## CEQA OVERVIEW

### A.  *Relevant CEQA Background*

We begin with a brief summary of the relevant provisions of CEQA.  Before a lead agency – in this case the City – may approve a project which may have a "significant effect on the environment," the lead agency must cause an EIR to be prepared. (§ 21151.)  An EIR is a detailed statement setting forth all significant effects on the environment of the proposed project, mitigation measures proposed to minimize any such effects and alternatives to the proposed project.  (§ 21100.)  CEQA defines "significant effect on the environment" as "substantial, or potentially substantial, adverse changes in physical conditions which exist within" the area which will be affected by the proposed project.  (§§ 21100, subd. (d), 21060.5.)  Before it may approve a project which could cause a substantial adverse change in the physical conditions of the affected area, the lead agency must find either that the significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-393 (*Laurel Heights*).)  Although the purpose of CEQA is to compel government to make decisions with environmental consequences in mind, CEQA " 'does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' "  (*Id.* at p. 393.)

3

At "the heart of CEQA," is the EIR, which our Supreme Court has characterized as an "environmental alarm bell," and a "document of accountability." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees." (*Ibid*.) Technical perfection in an EIR " ' "is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure." ' [Citations.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 979.)

The Guidelines which implement CEQA " 'are entitled to great weight and should be respected by the courts unless they are clearly erroneous or unauthorized.' [Citation.]" (*Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 490; *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1617.) However, while there must be strict compliance with CEQA, interpretation of the Guidelines is more flexible. (See *El Morro Community Assn. v. California Department of Parks and Recreation* (2004) 122 Cal.App.4th 1341, 1354 [appellate court "must also be mindful of the purposes of the statute in deciding how strict to be in interpreting the Guidelines"].)

*B.      The Statutory Standard of Judicial Review*

In any action to set aside an agency's decision under CEQA, "the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Judicial review of these two types of error differs significantly. Whether the agency has proceeded in a manner required by law – i.e., employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" – is determined de novo. (*City of Maywood v. Los Angeles Unified School District* (2012) 208 Cal.App.4th 362, 386.) Greater deference is accorded to the agency's substantive

4

factual conclusions, which are reviewed for substantial evidence. (*Ibid.*; *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 468; see e.g., *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).) "Substantial evidence" is defined as " 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made . . . is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative [or] evidence which is clearly erroneous or inaccurate . . . does not constitute substantial evidence.' " (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116-117 (*Save Our Peninsula*).) Courts pass only upon the EIR's sufficiency as an informative document, not upon the correctness of its environmental conclusions. (*Laurel Heights, supra*, 47 Cal.3d at p. 392.) An agency's approval of an EIR may not be set aside on the ground that an opposite conclusion would have been equally or more reasonable. (*Id.* at p. 393.)

The scope and standard of appellate review is the same as that in the trial court, and the trial court's findings are not binding on us. " 'We review the administrative record to determine whether the agency prejudicially abused its discretion.' [Citation.]" (*Save Our Peninsula, supra*, 87 Cal.App.4th at pp. 116-117.) Thus, we also consider whether the agency has proceeded as required by law and whether substantial evidence supports the agency's factual determinations.

As to factual determinations, we "must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. [Citation.] In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision." (*Save Our Peninsula, supra*, 87 Cal.App.4th at pp. 116-117.) "The burden of showing that the EIR is inadequate is on the party challenging the EIR." (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1562.)

5

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Draft EIR*

The EIR process here began in June 2007, with Vista's submission of its development application to the City.  The Draft EIR prepared by a City-retained consultant was submitted for public review between October 19, 2010 and December 3, 2010.

The "Planning Commission Final EIR" was prepared in February 2011.  It contained responses to all oral and written comments received on the Draft EIR, and described modifications made in response to those comments, staff recommendations and Planning Commission direction.  Following a hearing on February 15, 2011, the Planning Commission voted to recommend certification of the Final EIR and approval of the Project by the City.

B.    *The City's Final EIR*

The City's revised Final EIR is dated April 2011.  It included responses to comments received on the prior EIR's and to public testimony received at prior hearings.  Among other changes, the width of the River Corridor was increased by 100 feet, to an average of 800 feet.  In the revised Final EIR, more than 87 acres of the site are dedicated to the River Corridor.  Additionally, the number of residential units was reduced from 1,350 to 1,100; developed acreage was reduced from 100 acres to 89 acres; and parks and open space were increased from 18 to 21 acres.

On April 25, 2011, the day before the public hearing on the City's revised Final EIR, SCOPE submitted a letter challenging various aspects of the revised Final EIR, including a failure to adequately incorporate documents by reference.  Following a public hearing on April 26, 2011, the Council certified the Final EIR and adopted all necessary approval resolutions, ordinances and findings.  The notice of determination on the Project was filed on May 11, 2011.

*C.*     *The Petition for Writ of Mandate*

SCOPE filed the operative amended petition for writ of mandate and declaratory relief in October 2011.  It alleged the Project was inconsistent with the City's General Plan (first cause of action); the City failed to proceed in accordance with CEQA (second cause of action); and a genuine controversy existed as to whether the City complied with section 33207, subdivision (b), which gives the Santa Monica Mountains Conservancy (Conservancy) first right of refusal to purchase land the City is selling (third cause of action).

The trial court sustained the City's demurrer to the third cause of action, finding: (1) no private cause of action existed to enforce the Conservancy's rights under section 33207, and (2) SCOPE did not have standing.

Following a two-day hearing and postargument briefing, the trial court filed its statement of decision on April 29, 2013.[2]  The court granted the petition, finding the EIR inadequate in two respects:

- It prejudicially failed to comply with section 1510, subdivision (c) of the Guidelines, which requires documents incorporated by reference into the EIR to be summarized or described;
- The cumulative impact analysis of the Project on the River was inadequate because it was based on a study of the effect of development on the entire 1,036,571-acre Santa Clara River Watershed, of which the 185-acre Project was just a small part.

Rejecting SCOPE's remaining contentions, the trial court found the EIR was adequate in the following respects:

- Any defect in notice of the April 11 meeting was not prejudicial;
- SCOPE failed to exhaust its administrative remedies vis-á-vis their claim that the Project is inconsistent with the City's Specific Plan;

_____

**2**     On April 20, 2013, the trial court filed and served a "Tentative Ruling and Proposed Statement of Decision," which became the statement of decision by operation of law.

7

- SCOPE withdrew their claim that the City's Specific Plan could be adopted only by ordinance;
- Proper notice was given to the State Lands Commission;
- The EIR adequately analyzed whether the Project was consistent with the California Regional Water Control Board's Water Control Plan, Los Angeles;
- The EIR adequately analyzed the impact of additional chlorides added to the river as the result of urban runoff.

The trial court granted the petition for writ of mandate, set aside the approvals of the Project and the certification of the EIR, and ordered the City and Council to take no action to implement the Project. Judgment was filed on July 8, 2013. City timely appealed; SCOPE timely cross-appealed.

## DISCUSSION

### THE CITY'S APPEAL

The City challenges the trial court's findings that (1) the EIR did not properly incorporate documents by reference in the manner set forth in Guideline 15150, and (2) the EIR did not adequately consider the Project's cumulative effect on biological resources. We find the City's contentions are persuasive.

A. Documents Incorporated by Reference

1. **Standard of Review**

Whether the EIR complies with CEQA's information disclosure requirements presents a question of law subject to independent review by the courts. (*California Native Plant Society, supra*, 177 Cal.App.4th p. 986.) The adequacy of the incorporation of documents by reference is part of the information disclosure process as mandated by the Guidelines. Accordingly, we review this issue de novo. (*California Native Plant Society v. City of Santa Cruz, supra,* 177 Cal.App.4th at p. 987 ["the omission of required

8

information constitutes a failure to proceed in the manner required by law where it precludes informed decisionmaking by the agency or informed participation by the public," "[w]e review such procedural violations de novo"]; see also *Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1045-1046.)

> **2.** **Any Errors in Certifying a Technically Noncompliant EIR in this Case Were Not Prejudicial**

At the January 10 trial court hearing, counsel for Vista argued any failure to comply with Guildeline 15150, subdivision (c) was "a venial sin, at best."[3] The trial court found noncompliance was prejudicial because the requirement of brief summaries or descriptions of documents incorporated by reference is essential to the EIR's function as a document calculated to inform the public and decision makers of the details of the Project. On appeal, City contends there is not a "scintilla of evidence suggesting [SCOPE] had somehow been prejudiced by" the failure to fully comply with Guideline 15150, subdivision (c). SCOPE counters that, by incorporating so many documents by reference in a manner that does not comply with the Guidelines, important environmental analysis is "swamped" in a "sea of unimportant information."

We conclude the City substantially complied with CEQA's requirements, and that in the few admitted instances where the City failed to provide a description of an incorporated document, the error was not prejudicial, but rather an insubstantial omission or de minimis error that is not a ground for setting aside the City's approval of the EIR.

> *a.* *The governing legal principles*

Information or data that is relevant to an EIR, and is either a matter of public record or generally available to the public, "need not be repeated in its entirety" in the EIR, but instead may be cited as the source for conclusions in the EIR. (§ 21061.) In that

---

[3] A minor sin is often referred to as "venial," and might roughly equate with the law's notion of harmless error. (Merriam Webster's 10th Collegiate Dict. (1993) p. 1310.)

9

case, the information or data "shall be briefly described"; "its relationship to the environmental impact report shall be indicated"; and the source of the information or data must be reasonably available for inspection at a public place or public building. (*Ibid*.)

Section 21061 is implemented by several Guidelines. The one relevant here is Guideline 15150. That guideline specifies that an EIR "may incorporate by reference all or portions of another document which is a matter of public record or is generally available to the public." (Guideline 15150, subd. (a).) The guideline specifies where the incorporated document is to be made publicly available (*id.,* subd. (b)), and provides that the incorporated part of the document "shall be briefly summarized where possible or briefly described if the data or information cannot be summarized" (*id.,* subd. (c)). Like the statute, the guideline states that the "relationship between the incorporated part of the referenced document and the EIR shall be described." (*Ibid*.) The guideline also tells us that incorporation by reference "is most appropriate for including long, descriptive, or technical materials that provide general background but do not contribute directly to the analysis of the problem at hand."[4] (*Id.,* subd. (f).)

"Although an agency's failure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a)), under CEQA 'there is no presumption that error is prejudicial' (§ 21005, subd. (b)). Insubstantial or merely technical omissions are not grounds for relief. [Citation.] 'A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*Neighbors for Smart Rail v. Exposition Metro Line*

---

**4** Guidelines also govern citation of source documents, including "engineering project reports and many scientific documents relating to environmental features." (CCR 15148.) "These documents should be cited but not included in the EIR. The EIR shall cite all documents used in its preparation including, where possible, the page and section number of any technical reports which were used as the basis for any statements in the EIR." (*Ibid.*)

10

*Construction Authority* (2013) 57 Cal.4th 439, 463 (*Neighbors for Smart Rail*); *id.* at pp. 464-465 [failure to comply fully with CEQA's informational mandate "did not deprive agency decision makers or the public of substantial information relevant to approving the project, and is therefore not a ground for setting that decision aside"].)

> b.      *The claims of improper incorporation by reference in this case*

The procedural background for SCOPE's claims is as follows.

The Draft EIR, circulated in October 2010, stated in its introduction that it "references technical studies, analyses, and reports"; that information from those documents "has been briefly summarized in the appropriate section(s) of the Draft EIR"; and that "[a]ll documents referenced in the Draft EIR are incorporated by reference and available for public inspection . . . ."

It was not until six months after circulation of the Draft EIR, on April 25, 2011 -- the day before the final certification hearing -- that SCOPE's counsel submitted comments on the Draft EIR. Among SCOPE's claims was an assertion, for the first time, of a CEQA procedural violation, namely, that the EIR "incorporates numerous documents by reference, e.g. on pages 4-2.8-9 and 4.8-2-6, but does not summarize or describe them, and does not describe the relationship between the incorporated part of the referenced document and the EIR." (At the pages cited, the EIR incorporates by reference 17 and 61 documents respectively, in the Flood and Water Service sections of the EIR.) SCOPE's letter provided no further comment or explanation of the effect of this claimed procedural violation, simply asking the City to "recirculate the [EIR] after rectifying these errors."

During proceedings in the trial court, SCOPE's claim of error grew to include several more documents in four other sections of the EIR: three in section 3.0 (Cumulative Impact Analysis Methodology), one in section 4.5 (Noise), five in section 4.9 (Solid Waste Disposal), and one in section 4.20 (Santa Clara River Corridor Analysis). In its respondent's brief on appeal, SCOPE complains for the first time of

11

incorporations by reference in three more sections of the EIR, and asserts without citation to the record that "[t]here may be others."[5]

SCOPE appears to have made no effort to review for us the text of the EIR to see what the EIR says about, or the use it makes of, any particular incorporated document. Instead SCOPE contends, as it argues in its appellate brief, that the EIR must describe an incorporated document and its relationship to the EIR "at the point in the EIR text where it is incorporated, not at some other place in the text."

The EIR took a different approach. Usually, the EIR listed the incorporated documents in an introductory segment of the section in which they were used, but did not describe them there (except to the extent their titles shed light on their content).[6] The City tells us in its opening brief that, in most cases, the EIR properly described documents incorporated by reference (and their relationship to the EIR) at the point in the text of the EIR where the particular document was mentioned or used. The City compiled a table in its brief showing these locations for most of the documents. The City admitted that in 12 instances, documents were incorporated by reference but were not described or summarized anywhere in the EIR.

---

[5]  Because we reject SCOPE's claim of error on the merits, we do not consider the City's argument that SCOPE failed to exhaust its administrative remedies as to claims of improper incorporation in any sections of the EIR other than those identified in counsel's April 25, 2011 letter.

[6]  For example, at the beginning of the Water Service section (section 4.8), the EIR lists 61 documents that are incorporated by reference, explaining that existing conditions affecting water supply and demand in the Santa Clarita Valley "are thoroughly addressed in several documents listed below," and that the list "also identifies the documents that were used or relied upon in the preparation of this section." The EIR explains that "[t]he documents referred to throughout this section were used in formulating an independent determination of the sufficiency of the identified water supplies to meet the proposed demands of the proposed project and other related cumulative development."

## c.    The parties' contentions and our conclusions

As an initial matter, we reject SCOPE's contention that the required description of an incorporated document must appear at the precise point in the EIR where it is incorporated. Nothing in the guideline suggests any such requirement. It often may be more useful to the reader if the document and its relationship to the EIR are described at the relevant point in the EIR discussion. Although the location of the summary or description may be relevant to whether the wording complies with the Guidelines, in general, the placement seems plainly a choice for the lead agency to make.

### Contention No. 1:  Failure to Adequately Summarize

SCOPE advances three "independent arguments" that the City's incorporation by reference violated CEQA. We begin with its claim that "[v]ery few" of the documents incorporated by reference were adequately summarized or described as required by the guidelines.

As mentioned above, in its opening brief, the City provided a table showing, for each of the six EIR sections, where the incorporated documents were described or summarized. In response, SCOPE cited a *single example* of a purportedly inadequate description that it says "will illustrate the problem." But SCOPE's example – which it says is "typical of the purported descriptions or summaries" of the documents it claims are improperly incorporated by reference – does not support its claim.

SCOPE's example is one of the 17 documents incorporated by reference at the beginning of the Flood section. The document is entitled "Los Angeles County Department of Public Works, *Santa Clara River Enhancement and Management Plan, Flood Protection Report* (June 1968 Final Draft)" (the SCREMP report). The EIR then refers to the SCREMP report in the Flood section's discussion of Santa Clara River hydraulics. That discussion is part of a larger summary of the hydrologic and hydraulic methodologies used to analyze flood impacts (which is presented "to provide the reader with information necessary to understand the calculation of pre- and post-development runoff quantities, the capacities of proposed improvements, and the effects of

13

development on surface flows within the Santa Clara River Corridor during various modeled storm events").

After describing how the project model for the River was created, the EIR tells us that "[e]xisting Santa Clara River discharge rates [referring to discharges of storm runoff] for the 2-, 5-, 10-, 20-, and 50-year storm events" were obtained from the SCREMP report, which adopted the results of a 1994 study with respect to discharge values. (The EIR also refers to the SCREMP report in Appendix 4.2 (a June 2009 "EIR Flood Technical Report – Santa Clara River") for exactly the same point.)

In other words, the EIR informs the reader that the SCREMP report was the source for the discharge values used in connection with modeling the floodplain conditions of the Santa Clara River. SCOPE argues this does not constitute a "brief summary or description" of the SCREMP report (and "[t]o make matters worse," the EIR mistakenly ascribed the report to Ventura County instead of Los Angeles County). But the title of the report advises that it is a flood protection report for the Santa Clara River, and the text of the EIR and of Appendix 4.2 explain the precise purpose for which it was used in the EIR: as the source for discharge values used in connection with the modeling of floodplain conditions.

We fail to see how a more extensive description of the SCREMP report would add anything of significance to the EIR as an informational document. The relationship of the information in the SCREMP report to the EIR is clearly indicated: the report is the source of the specified discharge rates used in the EIR. This is enough information for the reader to make a reasoned decision on whether or not he or she wishes to read the SCREMP report.

SCOPE says the SCREMP report references we have just described are "typical" of the descriptions or summaries of incorporated documents that the City has identified in its brief. If that is true, then there is no significant flaw in the City's compliance with CEQA requirements. We have examined several other examples of documents incorporated by reference and likewise conclude that the descriptions of those documents sufficiently complied with the Guidelines.

14

Among the documents the EIR incorporates by reference at the beginning of the Flood section is "Chow, VT, *Open Channel Hydraulics*, McGraw Hill Civil Engineering Series (1959)" (the Chow document). The Chow document is then specifically mentioned in the EIR in Appendix 4.2, the June 2009 "EIR Flood Technical Report – Santa Clara River." The technical report cites the Chow document at two locations (pages 4486 and 4526 of the Administrative Record). The first reference is in a discussion of the River hydraulics. The second reference to the Chow document is in the technical report's discussion of the potential for erosion within the Santa Clara River. The report indicates that changes in flow velocities are the preferred indicator for potential streambed erosion, and cites the Chow document for the proposition that, "[b]ecause the riverbed is composed of alluvial materials, the non-erodible velocities (velocities below which no erosion would occur) range from 2.5 feet per second (fine gravels under clear flow conditions) to 5.0 feet per second (alluvial silts transporting colloidal materials) (Chow, 1959)."

There is no discrete summary or description of the Chow document in the technical report. But we have no difficulty understanding – from the text just described – the purposes for which the Chow document was used and its relationship to the EIR: e.g., to explain the basis for using a representative velocity of 4.0 feet per second as the appropriate indicator for erosion. So, even if this is not, strictly speaking, a brief summary or description of the Chow document, the document title and the text of the technical report that uses it tell us what the document is and the use the report makes of it. That is enough for a reader to decide whether the document is important enough to merit the reader's review. We view this as substantial compliance with Guidelines section 15150. Or stated differently, any departure from literal compliance was harmless.

A second example of incorporation by reference from the same section of the EIR (Flood, section 4.2) is "Simons, Li & Associates, Summary Report, Fluvial Study of Santa Clara River and the Tributaries (November 1990)" (the Simons document). The Simons document is specifically mentioned in the EIR in the discussion of existing

conditions in the River Channel and Floodplain, this way: "Previous studies (Simons and Li) have demonstrated that sediment deposition and scouring along the upper Santa Clara River are generally in equilibrium, and that there are no major trends of channel degradation or aggradation." The EIR then mentions other updated studies that provide more detailed analysis of aggradation and degradation trends in the river, and concludes that "[t]he results of this analysis are similar to previous reports in that the River is in a relative state of equilibrium and the proposed project impacts are not significant because they do not substantially modify existing conditions." The first statement describes the Simons document and the second statement describes its relationship to the EIR. Again, any literal noncompliance with the incorporation by reference Guidelines was not prejudicial.

We have also examined the instances of purportedly improper incorporation by reference that SCOPE first identified in its appellate brief, and find SCOPE's contention no more convincing. The first instance merely describes the process of incorporation by reference. In the other instances, the documents are incorporated by reference at the point where they are discussed, consistent with SCOPE's assertion documents should be described where they are incorporated. The second instance refers to several research papers cited in section 4.3 (Traffic and Access) "that are applicable to the proposed project's travel characteristics." The findings of those studies are clearly summarized (e.g., "[t]he following summarizes some key findings from that research," followed by four key findings), and their pertinence to the subject under discussion is perfectly clear. The same is true of the third instance, an alternative fuels plan incorporated by reference in the EIR section on Global Climate Change; its "main finding" is clearly stated, and the EIR specifies the use of that plan's approach in the ensuing discussion.

In short, SCOPE has not demonstrated that any document was incorporated in a manner that makes it difficult for the reader to understand the purpose for which the document was used and its relationship to the EIR. Nevertheless, the City acknowledged it failed to describe 12 documents that it incorporated by reference in the Flood, Water

16

Service, and Solid Waste Disposal sections of the EIR. We discuss the significance of this concession next.

The EIR incorporates by reference 17 documents at the beginning of the Flood section, stating that, "[i]n addition to the project-specific technical reports available in Appendix 4.2, the following documents are referred to, referenced, or cited in this EIR section . . . ." Seven of these, the City admits, are not summarized or described elsewhere.

The EIR identifies 61 documents incorporated by reference at the beginning of the Water Service section that "were used in formulating an independent determination of the sufficiency of the identified water supplies to meet the proposed demands of the proposed project and other related cumulative development." Of these 61 documents, the City admits that 4 are not described or summarized.

In the introduction to section 4.9 (Solid Waste Disposal), the EIR states that "information for this section was gathered from" three listed documents that are incorporated by reference. One of these, the City admits, is not summarized or described elsewhere: "*Waste Generation Base Year Study for Reporting Year 2000* (March 2002)."

We are not persuaded that these admitted errors in complying with the CEQA guideline are anything more than "[i]nsubstantial or merely technical omissions" that are not grounds for setting aside an EIR. (*Neighbors For Smart Rail, supra,* 57 Cal.4th at p. 463.) Our conclusion is informed by the well-established principle that CEQA "requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection" (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco, supra*, 227 Cal.App.4th at p. 1046), and the similar notion that "the 'determination of EIR adequacy is essentially pragmatic.' [Citation.]" (*Ibid.*)

We find no purpose would be served by decertifing the EIR. While the City, technically speaking, failed to proceed in the manner required by law in at least the 12 instances it has identified, to decertify the EIR for that reason would senselessly elevate form over substance, because SCOPE has failed to show prejudice. SCOPE has failed to articulate any argument that the EIR process was harmed by the failure to summarize

17

those documents.  As another court has said, "To conclude . . . that the [agency's] error justifies overturning the [agency's] decision would amount to presuming prejudice, which we cannot do."  (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 710; see *id.* at pp. 708-710 [by failing to provide a full 30-day review period (because the last three days were a holiday weekend), the agency did not proceed as required by law and thereby abused its discretion, but no prejudice was shown; there was no evidence "that anyone who wanted to was prevented from reviewing the pertinent documents or from submitting comments" and "no one appeared at the public hearing to complain" that the truncated review period prevented them from participating].)

SCOPE does not tell us, with respect to any of the 12 incorporated documents, for example, how the omission of the required description of that document " 'preclude[d] informed decisionmaking and informed public participation' " or "deprive[d] agency decision makers or the public of substantial information relevant to approving the project . . . ."  (*Neighbors for Smart Rail, supra,* 57 Cal.4th at pp. 464-465.)  Indeed, at oral argument, counsel conceded that he could identify no incorporated document that may have caused a reader of that document to understand the EIR in a different light.  Since that is the case, there is no basis for us to conclude the omission of a summary of any document deprived the public or decision makers "of substantial information relevant to approving the project . . . ."  (*Id.* at p. 465.)

### *Contention No. 2:  Over Incorporation by Reference*

This brings us to SCOPE's next contention, which it advances as "independent" from its claim of noncompliance with Guidelines 15150, subdivision (c).  SCOPE contends that the public and decision makers are prejudiced because the City incorporated *too many* documents by reference, "making it extremely difficult to determine what the EIR says on a particular subject."  (Instead, SCOPE tells us, most of the incorporated documents should have been merely cited (as allowed by Guideline 15148) or included as appendices to the EIR (as allowed by Guideline 15147).)  According to SCOPE, the City incorporated "17,468 pages of abstruse technical reports" into the body of the EIR, making it "virtually impossible for decision-makers or the

18

public to comprehend the document as a whole, since the material is considered to be part of the text of the EIR." Further, SCOPE says, the reader, "to find the good-faith reasoned analysis required by CEQA," must scan not only the EIR text, "but also the more than 17,468 pages of text incorporated by reference into the body of the EIR." SCOPE concludes that because the incorporation by reference of so many documents "bur[ied] the required analysis in a mass of unimportant and marginally [*sic*] detail, no further showing of prejudice may be required."**7**

This argument rests on the pretension that the incorporated documents are physically a part of the EIR (making the EIR "really, really long"). That is the only reason we can conceive for SCOPE's claim that the required analysis is "bur[ied]" in a mass of unimportant detail, when it very clearly is not. The whole point of incorporation by reference is to avoid bogging down the analysis. The guideline expressly states that incorporation by reference is "most appropriate for including long, descriptive, or technical materials that provide general background but do not contribute directly to the analysis of the problem at hand." (Guidelines 15150, subd. (f).) That is exactly what the City did here. While we can imagine in theory that the sheer number of undescribed documents incorporated by reference might make an EIR unreadable or otherwise cause noncompliance with CEQA to be prejudicial, SCOPE has not articulated how in this case, prejudice has occurred.

The body of the EIR contains the required analysis, and refers to materials incorporated by reference. That is how incorporation by reference is supposed to work, and that is how it works in this EIR. Of course, where the EIR refers to incorporated

---

**7**    SCOPE told the trial court that "this is another sort of technical point where the City did not proceed in a manner required by law . . . ." SCOPE explained that "the stuff that's incorporated by reference is included in the EIR under the CEQA guidelines, and that makes this EIR really, really long, and it makes it contain a whole bunch of stuff that, arguably at least, shouldn't be in the EIR. It should be in the appendices or documents that are cited." When the court asked if counsel could give "some examples of that. Of what's been buried and what hasn't been and what the references are," counsel replied, "No, Your Honor. We are not saying there are things that were hidden actually in the appendices. It's just a procedural error."

19

materials not summarized elsewhere, the discussion should give sufficient information about the incorporated material to allow the reader to decide whether he or she wishes to inspect the incorporated document.  But SCOPE's own example of the SCREMP report and others we have examined confirm that this EIR provided sufficient information to serve this purpose, and SCOPE has identified no reference that did not (except for the 12 admitted, immaterial errors).

None of the cases SCOPE cites supports a finding of prejudice in this case. SCOPE refers us to *Vineyard, supra,* 40 Cal.4th at page 442, for the proposition that the "wholesale incorporation of documents" caused prejudice "by violating CEQA's requirement that the EIR present information in a manner calculated to adequately inform the public and the decision makers."  But in *Vineyard*, the agency "relied on information not actually incorporated or described and referenced in the [final EIR]" (*id.* at p. 442), and as a result the project's significant environmental effects were not clearly explained (*id.* at p. 443).  That is not the case here.

SCOPE cites *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 659, which states that "[t]he decision makers and general public should not be forced to sift through obscure minutiae or appendices in order to ferret out the fundamental baseline assumptions that are being used for purposes of the environmental analysis."  But *San Joaquin Raptor* plainly describes a specific matter of substance that was missing from the body of the EIR there:  "The real problem . . . is that the EIR does not clearly identify the baseline assumptions regarding mine operations in its description of the existing environmental setting." (*Ibid.*)  SCOPE points to no similar flaw in this case.

SCOPE relies on *People v. County of Kern* (1974) 39 Cal.App.3d 830, for the proposition that the agency must "fully comply with the letter of the law" to avoid "subversion of the important public purposes of CEQA . . . ."  (*Id*. at p. 842.)  But in *Kern* the final EIR was "fatally defective" because the agency "fail[ed] to respond with specificity in the final EIR to the comments and objections to the draft EIR . . . ."  (*Ibid*.)

Finally, SCOPE cites *Environmental Protection Information Center v. California Dept. of Forestry* (2008) 44 Cal.4th 459, 485 (*EPIC*), quoting *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1022-1023 (*Rural Landowners*), for the proposition that an agency's failure to comply with CEQA by omitting information from the CEQA review process "is automatically deemed prejudicial." *EPIC* stands for no such proposition. *EPIC* quotes *Rural Landowners* for the conclusion that " 'where . . . failure to comply with the law results in a subversion of the purposes of CEQA by omitting information from the environmental review process, the error is prejudicial' " (and the trial court may not find the error harmless by determining that the ultimate decision of the lead agency would not have been affected if the law had been followed). (*EPIC,* at p. 485.) *EPIC* does not say that any omission of information is "automatically deemed prejudicial"; an omission is prejudicial only if it " 'results in a subversion of the purposes of CEQA . . . .' " (*Ibid.*) Both cases involved an agency's failure to consider public comments, not the incorporation of documents by reference. *EPIC* tells us that "[i]f it is established that a state agency's failure to consider some public comments has frustrated the purpose of the public comment requirements of the environmental review process, then the error is prejudicial", but that "[o]n the other hand, an agency's failure to consider public comments is not necessarily prejudicial." (*Id.* at p. 487.) In *EPIC*, the agency's failure to consider the comments was not prejudicial because the comments were concededly duplicative. (*Id*. at p. 488.) In *Rural Landowners*, the agency did not consider the substantive comments of other state agencies before approving the EIR, a prejudicial error that "result[ed] in a subversion of the purposes of CEQA." (*Epic,* at pp. 1019, 1023.) There was no subversion of the purposes of CEQA in this case.

The single California case that has considered a claim of error in failing to summarize incorporated documents concluded the complaint was "insubstantial" and the petitioners failed to demonstrate such an error was prejudicial. (*Fort Mojave Indian Tribe v. California Department of Health Services* (1995) 38 Cal.App.4th 1574, 1600-1601 (*Fort Mojave*).)

*Fort Mojave* involved an agency's approval of an EIR and license for the construction and operation of a low-level radioactive waste disposal facility. (*Fort Mojave, supra,* 38 Cal.App.4th at p. 1581.) Petitioners sought to invalidate the agency's decisions certifying the EIR and granting the license. (*Ibid.*) One of their claims was error in the agency's "failure to publicly distribute not the EIR itself, or the license application that was incorporated by reference into it, but various other documents that in turn were incorporated by reference into the license application," as well as "the EIR's failure specifically to summarize some such documents." (*Id.* at p. 1600.) The court found this complaint "insubstantial" for two reasons: The license application itself was "a generally accessible matter of public record, as CEQA requires for documents incorporated by reference into an EIR," and "even assuming [the agency] fell short of its obligations with respect to release of certain subsidiary license documents, petitioners have failed to demonstrate that such an error was prejudicial." (*Id.* at pp. 1600-1601.) The court also rejected the petitioners' assertion that the ultimate release of some of the doubly incorporated material required a supplemental EIR, saying this contention was "blunderbuss and nonspecific." (*Id.* at p. 1601.)

SCOPE says *Fort Mojave* is "easy to distinguish" because it involved an "insubstantial few" documents, in contrast to the "huge" number of documents incorporated by reference in this case, and because, unlike in *Fort Mojave*, "SCOPE has adequately shown prejudice to the decision-makers and the public . . . ." We disagree. First, SCOPE has no basis to say there were an "insubstantial few" documents in *Fort Mojave* because the appellate court did not identify the number of documents incorporated in the license application. Second, unlike in *Fort Mojave*, the incorporated documents here *were* publicly available. And finally, as we have seen, SCOPE has *not* shown prejudice; it has merely made the claim, without the support of a single example, that a reader must read all the incorporated documents "to find the good faith reasoned analysis required by CEQA."**8**

---

**8** One federal district court case found the failure properly to incorporate by reference "the entire text of a critical cumulative impacts analysis" was a prejudicial

22

In sum, SCOPE has not shown, in any meaningful way, that the omission of summaries of incorporated documents (or the incorporation of documents that could have been merely cited instead of incorporated, or both) in any way precluded informed decisionmaking or informed public participation, and thereby "thwart[ed] the statutory goals of the EIR process." (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 463.)

### *Contention No. 3:  Incorporation of Water Supply EIRs*

SCOPE's third argument is that the City violated Guidelines section 15150, subdivision (d) when it incorporated by reference 10 water-supply-related EIR's in the Water Service section.  Section 15150, subdivision (d) states that "the state identification number of the incorporated [EIR] should be included in the summary or designation described in subdivision (c)."  SCOPE complains that while the state identification number was given for each of these EIR's at the point where the documents were incorporated (at the beginning of the section), the number was not included in the subsequent summary or description of those EIR's.  (We note this concedes there was in fact a subsequent discussion of these water-supply-related EIR's in the City's EIR.)  SCOPE's claim has no merit.  The rule states the identification numbers should be included in the "summary or designation," and they *were* included at the point where the City designated the documents as incorporated by reference.  This is not a violation of the guideline, and in any event SCOPE identifies no prejudice from this approach.

### B.     The Project's Cumulative Biological Effects

The City's second major challenge to the trial court's ruling deals with the trial court's finding that the EIR did not adequately consider the Project's cumulative effects because the EIR's analysis  was based on the 2010 Santa Clara River Watershed Study

abuse of discretion under CEQA as well as under federal law, violating section 21061 and Guidelines section 15150, subdivision (c).  (*City of Carmel-By-The-Sea v. United States DOT* (N.D.Cal., July 22, 1998, Civ. No. 92-20002 SW) 1998 U.S.Dist. Lexis 21441, pp. 15, 12-16.)  In that case, the environmental impact statement itself was "devoid of any substantive discussion of the cumulative impacts" of certain developments.  (*Id.* at p. 6.)

23

prepared for the Newhall Land and Farming Company (the Watershed Study). That study considered the entire 1,036,571 acres of the Santa Clarita River Watershed. The trial court found reliance on the Watershed Study was an abuse of discretion because the Project constitutes such a small portion of the entire watershed that assessment of the Project's impact on the watershed dilutes the Project's environmental impacts on the "riparian zone and uplands of the Santa Clara River, a vastly smaller region." The City argues the EIR properly defined and explained the geographic scope of its cumulative impact analysis as required by Guidelines, section 15130. We conclude substantial evidence supports the City's method of assessing the Project's cumulative effects and reverse the trial court's decision on that ground.

### 1. *Cumulative Impact Analysis Overview*

The EIR must identify the project's significant effects on the environment. (§§ 21100, subd. (b)(1), 21002.1.) CEQA defines "environment" as "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.) But the "area which will be affected by a proposed project" is not limited to the project area boundaries because projects often have effects on areas outside their boundaries. (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 173, citing *Muzzy Ranch Co. v. Solano County Airport Land Use Com* (2007) 41 Cal.4th 372, 387.) Likewise, the project's effects on the environment cannot be considered in isolation from the combined effects on the environment of closely related past, present and probable future projects. Thus, the EIR must analyze the "cumulative effects" of the project, which the Guidelines define as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts. [¶] (a) The individual effects may be changes resulting from a single project or a number of separate projects. [¶] (b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project, when added to other closely related past, present, and

24

reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Guidelines, § 15355; see *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 700.) " 'Cumulative impacts analysis evaluates the incremental impact of the project in conjunction with, or collectively with, other closely related past, present, and reasonably foreseeable probable future projects.' [Citation.] ' " '[T]he discussion of cumulative impacts should be guided by the standards of practicality and reasonableness.' " ' [Citation.]" (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1228 (*Banning Ranch*).) Stated simply, several seemingly minimal impacts on the environment can collectively have a significant ecological impact.

Necessary to an adequate discussion of significant cumulative impacts is "*either* '(A) A list of past, present, and probable future projects producing related or cumulative impacts, including, if necessary, those projects outside the control of the agency, *or* [¶] (B) A summary of projections contained in an adopted [general] plan, or related planning document, [or in a] prior environmental document' which has been adopted or certified, which described or evaluated regional or areawide conditions contributing to the cumulative impact. 'Any such [planning] document shall be referenced and made available to the public at a location specified by the lead agency.' [Citation.]" (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 928-929, italics added (*Rialto*), citing Guidelines, § 15130, subd. (b)(1)(A) & (B).)

### 2. *Standard of Review*

The substantial evidence standard applies to challenges to the methodology used for studying impact. (*Banning Ranch, supra,* 211 Cal.App.4th at p. 1230.) There are no invariable rules or procedures for determining the size of the cumulative assessment area. (See *East Bay Mun. Utility Dist. v. California Dept. of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113 (*East Bay*) [analogizing cumulative impact analysis of timber harvest plan under Z'berg-Negedly Forest Practice Act of 1973 to cumulative impact

25

analysis under CEQA].)  Rather, "selection of the assessment area is left to the agencies' expertise, and '[a]bsent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.  [Citation.]'  [Citation.]"  (*City of Long Beach v. Los Angeles Unified School District* (2009) 176 Cal.App.4th 889, 907-908 (*City of Long Beach*); *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1351 [selection of cumulative assessment area is a matter for agency's discretion]; *East Bay,* at p. 1131 [substantial evidence supported method of assessing cumulative impacts].)

In *East Bay*, the appellate court rejected the utility district's argument that the department had improperly defined the size of the watershed assessment area to artificially understate impacts of timber harvesting.  (*East Bay, supra,* 43 Cal.App.4th at p. 1128.)  The court found considerable evidence that the department "was attempting to use a watershed assessment area which was small enough to detect impacts, but not so small as to reduce any impact to insignificance.  Although the plans routinely set out in a ratio the size of the area within the plan compared to the entire Mokelumne River watershed, that ratio gave only one measure of potential impacts.  Moreover, there was testimony that [the department]did not limit its cumulative impact study to the watershed assessment area as described by the plan, but also looked at activities and conditions upstream and downstream of the proposed plan and at watershed impacts from activities and projects predating or unrelated to Georgia Pacific's operations."  (*Ibid*.)

Our inquiry is limited to whether substantial evidence supports the City's determination of the configuration for its cumulative impact assessment.

### 3.    *The Watershed Study*

The federal Environmental Protection Agency (EPA) defines a watershed as "that area of land, where all of the water that is under it or drains off of it goes into the same place."  (http://water.epa.gov/type/watersheds/whatis.cfm.)  The River, flows west from its headwaters near Acton, California to the Pacific Ocean near the City of Ventura.  The River Hydrologic Basin and associated watershed cover approximately 1,036,571 acres.

Almost half that acreage is in the City of Santa Clarita and surrounding unincorporated parts Los Angeles County.

The EIR's cumulative impacts analysis relied in part on the October 2010 Watershed Study, which was included in Appendix 4.5 (Biological Resources) to the EIR for the "Newhall Ranch Resource Management and Development Plan and the Spineflower Conservation Plan" EIR, which was approved in December 2010 by the Department of Fish and Game acting as the lead agency.[9] The stated purpose of the Watershed Study was "to analyze the cumulative impacts of development, including past projects, current land use classifications, and future approved and planned projects; to biological and abiotic resources and ecological functions and processes within the watershed." "The framework of the study is to describe existing and potential future developments in the entire watershed."

Section 3.3 of the Watershed Study discusses the impact of planned and approved projects in the five sub-basins located in the City of Santa Clarita and/or Los Angeles County. Section 3.4 discusses the impact of planned and approved projects in the Newhall Land Project area. In the section captioned "Cumulative Impacts to Jurisdictional Waters and Wetlands within the Watershed," the Watershed Study states: "[F]rom about 1988 to 2006, there has been a substantial cumulative net gain in mitigated acreage over impacts. In other words, based on [the analyzed data] there should be more jurisdictional wetlands and waters today than there were in 1988 . . . ." The Watershed Study concludes that, "As new projects are approved and constructed, with a better understanding and improvement of technologies of waters and wetlands protection and

_____

**9** SCOPE argues that nothing in the administrative record "indicates that the Watershed Study was adopted by any public agency, as required by" Guideline 15130, subdivision (b)(1)(B). Pursuant to Evidence Code, section 452, subdivision (c), we take judicial notice of the Notice of Determination and Decision, filed on December 3, 2010, stating that the Newhall Ranch Resource Management and Development Plan and Spineflower Conservation Plan was approved by the Department of Fish and Game. (Evid. Code, § 452, subd. (c) [official acts of executive departments of any state are subject to judicial notice]; *Taiheyo Cement U.S.A., Inc. v. Franchise Tax Bd.* (2012) 204 Cal.App.4th 254, 268, fn. 5 [official acts of the executive department includes records, reports and orders of administrative agencies].)

restoration, it is further likely that wetland and riparian functions and values in the watershed will be enhanced in the future."

### 4. *The EIR's Cumulative Impact Analysis*

The 185-acre Project site, which is bisected by the River, represents 0.15 percent of the upstream watershed and 0.018 percent of the entire watershed. The stretch of the River within the project area is characterized by a wide, meandering channel, the active portion of which ranges in width from 28 to 64 feet. This stretch of the River is dry except in periods of heavy rainfall. As such, it meets the EPA's definition of an "ephemeral" stream, which is a stream that "flow[s] briefly in direct response to precipitation in the immediate vicinity, and whose channel is at all times above the ground-water reservoir."[10]

The cumulative impact of the Project on biological resources, including the River, is discussed in section 4.6 of the EIR, which lists 109 past, present and probable future projects within 12 miles of the Project in both the City of Santa Clarita and unincorporated parts of Los Angeles County.[11] The EIR explains that, because the list of projects does not specify the cumulative impacts of those projects "to sensitive biological resources, the EIR has relied on [the Watershed Study which] has accessed the cumulative impacts of development on biological resources, as well as ecological functions and processes, within the [watershed] . . . [The Watershed Study utilizes] a more extensive list of past, present, and reasonably foreseeable cumulative projects

---

[10] By contrast, "intermittent" streams are those which "flow continuously only at certain times of the year, for example when it receives water from a spring, ground-water source or from a surface source, such as melting snow (i.e. seasonal). At low flow there may be dry segments alternating with flowing segments." Sixty-six percent of the streams in California are "ephemeral" or "intermittent" streams. Perennial streams are waterways that constantly have water. The eastern most stretches of the River in the Angeles National Forest exhibit some perennial flow.

[11] Table 4.6-6 lists 33 past, present and probable future projects in the City of Santa Clarita; Table 4.6-7 lists 76 past, present and probable future projects in Los Angeles County.

within the [watershed] than is shown on the lists of City/County projects cited in this EIR. As a result, the Watershed Study is necessarily a broader cumulative impacts assessment on biological resources in both the project vicinity and the region."

The EIR concludes that the Project "would permanently convert acreage from a mostly undeveloped and highly disturbed property to that of an urban environment. Cumulative impacts related to development of the project site would include reducing total vegetation and wildlife habitat area and open area in the Santa Clarita Valley region. [¶] Construction and operation of uses developed on site would directly impact wildlife on and near the [Project] site. Within the planned development area, species of low mobility would be lost during site preparation. Conversion of existing undeveloped land to developed uses consisting of structures and landscaping would eliminate some natural vegetation communities on developed portions of the project site and result in a reduction in native wildlife species diversity. Buildout of uses within the project site would also limit the local movement of wildlife species that currently make use of areas proposed for development. [¶] However, the [Project] mitigates the project's identified impacts to sensitive biological resources to a less than significant level; and therefore, would not result in cumulatively considerable impacts to the region based on the watershed analysis presented in the Watershed Study. Specifically, the [Project] site constitutes a very small proportion of the overall watershed and planned development on site would not significantly contribute to the overall development in the watershed, or to the amount of development allowed under current land use classifications. Based on its location, the [Project] also would not significantly impact regional wildlife corridors and habitat linkages within the [watershed]."[12]

----

[12] City's argument that no cumulative impact analysis was necessary since the Project mitigated the impacts to a less than significant level is not persuasive. Known as the "fair argument standard," an EIR must be prepared if there is "substantial evidence supporting a fair argument that the proposed project may have a significant adverse effect on the environment. [Citations.] When the fair argument standard is met, the lead agency must prepare an EIR analyzing the project's potential impacts on the environment before approving the project. [Citation.] The fair argument standard is a low threshold.

## 5. *The Cumulative Impact Assessment Complied With CEQA*

Guidelines, section 15130, subdivision (b) requires the discussion of cumulative impacts to "reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided for the effects attributable to the project alone. . . . The following elements are necessary to an adequate discussion of significant cumulative impacts: [¶] (1) Either: [¶] (A) A list of past, present, and probable future projects producing related or cumulative impacts, including, if necessary, those projects outside the control of the agency, or [¶] (B) A summary of projections contained in an adopted local, regional or statewide plan, or related planning document, that describes or evaluates conditions contributing to the cumulative effect. Such plans may include: a general plan, regional transportation plan, or plans for the reduction of greenhouse gas emissions. A summary of projections may also be contained in an adopted or certified prior environmental document for such a plan. Such projections may be supplemented with additional information such as a regional modeling program. Any such document shall be referenced and made available to the public at a location specified by the lead agency."

Here, SCOPE did not challenge, and the trial court made no finding as to the adequacy of the EIR's cumulative impact analysis using the "list" method set forth in Guidelines, section 15130, subdivision (b)(1)(A). It nevertheless decertified the EIR based on its finding that the cumulative impact assessment was inadequate under Guidelines, section 15130, subdivision (b)(1)(B) because it was based on the Watershed Study. The trial court framed the issue as follows: "Why is a study that concerns an area of 1,620 square miles (1,036,571 acres) the appropriate base against which to measure the environmental impacts of this project, which comprises an area of less than .3 square miles (185 acres)?"

---

[Citation.]" (*Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 364.) The Project meets this threshold.

Having found no fault with the list method (Guidelines, § 15130, subd. (a)(1)(A)), the trial court erred in decertifying the EIR based on its conclusion that the Watershed Study was inadequate under 15130, subdivision (b)(1)(B).[13] As we shall explain, in light of the "present scientific understanding of the ecology and hydrology of ephemeral and intermittent streams" such as the River, it was not an abuse of discretion for the City to base its cumulative impact analysis on the Watershed Study.

The EPA, in a 2008 publication entitled "The Ecological and Hydrological Significance of Ephemeral and Intermittent Streams in the Arid and Semi-arid American Southwest," states the agency's strong preference for considering a larger watershed over a specific site in assessing a project's cumulative impacts on an environment such as the one in which the Project is located: "Individual ephemeral or intermittent stream segments should not be examined in isolation." The publication goes on to say: "Managing from a watershed context is more effective than focusing on a specific site, such as an individual ephemeral or intermittent stream segment, because actions by humans, wildlife and nature can have widespread effects, crossing political boundaries and impacting downstream water quality and ecosystem health. The accumulation of impacts over large areas in the rapidly developing southwest suggests a landscape or water-shed scale approach that considers cumulative effects on overall watershed function."

That it was not unreasonable for the City to include the watershed in the cumulative impact assessment area is further highlighted by a 2009 letter to the City, in which the California Department of Fish and Game expressed concern regarding direct and indirect impacts of the Project "to the Santa Clara river watershed and the associated vegetation communities and wildlife."

---

**13** On appeal, SCOPE complains the EIR's list of past, present and probable future projects is not sufficient to satisfy Guidelines, section 15130, subdivision (a)(1)(A) because it contains no information about how each project might affect biological resources. Having failed to challenge the list-based approach in the trial court, SCOPE has waived the issue on appeal. (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959 [party may not raise new issues not presented in the trial court].)

31

In light of the Department of Fish and Game's concerns, and the EPA publication, we find no abuse of discretion in the City's consideration of the Watershed Study in its cumulative impact assessment. (See *City of Long Beach, supra*, 176 Cal.App.4th at pp. 907-908 [absent a showing of arbitrary action, we must assume that the agency has exercised its discretion appropriately in selecting a cumulative assessment area].) Accordingly, the trial court erred in ordering decertification of the EIR on that basis.

## SCOPE'S CROSS-APPEAL

### A.      SCOPE's Contentions

In its cross-appeal, SCOPE contends: (1) the Project, including the Specific Plan and Tract Map, is inconsistent with the City's General Plan; (2) the EIR failed to adequately analyze the adverse effects of the Project on chloride pollution in the River; and (3) the trial court erred in sustaining the City's demurrer to the third cause of action. We find no merit in any of these contentions.

### B.      Substantial Evidence Supports the Conclusion that the Project Is Not Inconsistent With the City's General Plan

SCOPE contends the Project, including the Tract Map and Specific Plan, are "fatally inconsistent with the [City of Santa Clarita] General Plan." They make three arguments: (1) allowing development of the area around the River is inconsistent with the General Plan's various stated goals and policies including maintaining the River as open space and preserving existing Significant Ecological Areas (SEA's); (2) the amendment to the General Plan is too vague; and (3) because the amendment makes the General Plan inconsistent, the Specific Plan and Tract Map cannot be consistent with the General Plan. Substantial evidence supports the City's contrary conclusion.

#### 1.      Overview of Local Land Use Laws

We begin our discussion with a brief overview of the hierarchy of local laws regulating land use. At the top of that hierarchy is the "general plan," which is a

32

"comprehensive, long-term general plan for the physical development" of the city. (Gov. Code, §§ 65300, 65350.) The general plan is frequently referred to as a "constitution for future development." (*Foothill Communities Coalition v. County of Orange* (2014) 222 Cal.App.4th 1302, 1310 (*Foothill*).) The propriety of virtually all land use and development decisions by the city depends upon their consistency with the applicable general plan. (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 196.)

Next in the hierarchy is the "specific plan" which covers a specific part of the community and is more detailed than the general plan. (*Foothill, supra*, 222 Cal.App.4th at p. 1310; see Gov. Code, § 65450 et seq. [specific plans, generally].) "No specific plan may be adopted or amended unless the proposed plan or amendment is consistent with the general plan." (Gov. Code, § 65454.) The specific plan must include a statement of the relationship of the specific plan to the general plan. (Gov. Code, § 65451.)

Because a city's needs change over time, cities have the power to amend both the general and specific plans as circumstances require. (*Foothill, supra*, 222 Cal.App.4th at p. 1310; Gov. Code, §§ 65358 [general plan], 65453 [specific plan], 65359 ["Any specific plan or other plan of the city or county that is applicable to the same areas or matters affected by a general plan amendment shall be reviewed and amended as necessary to make the specific or other plan consistent with the general plan."].)

### 2. Standard of Review

Because the City's determination that the Project is consistent with the general plan constitutes a finding of fact, abuse of discretion under CEQA's standard of review is established if the determination is not supported by substantial evidence. (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 514.) We accord great deference to City's determination because, as the legislative body which adopted the general plan policies, it " 'has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be

33

allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citation.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.]" (*Pfeiffer v. City of Sunnyvale City Council*, *supra*, 200 Cal.App.4th at p. 1563.)

### 3. The Finding of General Plan Consistency Was Not An Abuse of Discretion

SCOPE contends allowing development of open space in the River Corridor is inconsistent with the Goals and associated Policies of the General Plan which promote the preservation of the River as open space. We find no abuse of discretion in the City's conclusion to the contrary.

A project need not be in perfect conformity with each and every policy stated in the general plan. It is sufficient if the project is compatible with the objectives, policies, general land uses and programs specified in the general plan, and furthers the objectives and policies of the general plan. (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at pp. 513-514.) CEQA does not guarantee that land-use and planning decisions will always favor environmental considerations over other considerations. (*Laurel Heights, supra*, 47 Cal.3d at p. 393.)

The City's General Plan identifies many inherently competing objectives. For example, in the "Land Use Element," the General Plan identifies the objectives of "the identification of opportunities for new development and redevelopment in the City and planning area" and the "preservation of undeveloped natural and cultural resource areas in and around the environs of the City." SCOPE challenges the Project's consistency with Goal 1, Policies 1.1 and 1.9 and Goal 3, Policies 3.3 and 3.5 of the General Plan's "Open Space and Conservation Element." Goal 1 is: "To preserve the special natural features which define the Santa Clarita planning area and give it its distinct form and identity." Goal 1 is supported by Policy 1.1 ("[u]tilize major environmental features

34

(significant landforms, significant ridgelines, significant vegetation, ecologically significant areas, other natural resources) as open space") and Policy 1.9 ("[e]stablish the Santa Clara River and its tributaries, when appropriate, as a major centralized open space corridor linking a variety of public recreation and open space uses"). Goal 3 is: "To protect significant ecological resources and ecosystems, including but not limited to, sensitive flora and fauna habitat areas." Goal 3 is supported by Policy 3.3 ("[i]dentify and protect areas of significant ecological value, including but not limited to, significant ecological habitats such as the wildlife corridor between the Santa Susana Mountains and the San Gabriel Mountains and preserve and enhance existing Significant Ecological Areas (SEA's)"); and Policy 3.5 ("[p]romote only compatible and, where appropriate, passive recreational uses in areas designated as Significant Ecological Areas (SEA's) consistent with the particular needs and characteristics of each SEA, as determined by field investigation").

The General Plan expressly does *not* preclude development in and around SEA's, including the River: "While development is not prohibited within SEA's, it should be designed in order to preserve the SEA and assure its ongoing viability. SEA's should be considered prime candidates to be acquired for public open space."

The EIR includes a detailed "General Plan Consistency Analysis," which lists each Goal and Policy stated in the General Plan and explains how the Project relates to each. Thus, the EIR reflects that City officials considered the General Plan's stated goals and policies and the extent to which the Project conformed to those stated goals and policies. The City's resolution approving the Project finds: "The Vista Canyon Specific Plan would implement the objective and policies of the General Plan.[14] That SCOPE disagrees with the City's conclusions is beside the point.

---

[14] SCOPE's assertion that this statement is not entitled to deference because it is not an "express" finding of consistency with the general plan also fails. No magic words are necessary to constitute a finding of consistency. Implicit in the finding that the Specific Plan would implement the objectives and policies of the General Plan is that it is consistent with the General Plan.

### 4.  The General Plan Amendment Is Not Too Vague

We also find no merit in SCOPE's argument that the amendment to the General Plan is "too vague for the Specific Plan and Tract Map to be consistent with the General Plan:"  Specifically, SCOPE complains that the description of the new SEA area is not sufficiently detailed.

At the time relevant to these proceedings, Government Code section 65302, subdivision (a) provided:  "The general plan shall consist of a statement of development policies and shall include a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals."  It must designate the "general location and extent of the uses of the land for housing, business, industry, open space, including agriculture, natural resources, recreation, and enjoyment of scenic beauty, education, public buildings and grounds, solid and liquid waste disposal facilities, and other categories of public and private uses of land."  (*Ibid.*)

The City amended the General Plan by Resolution No. 11-23.  According to that resolution, the Project's original 2007 application ("Master Case 07-127") requested the following:

> 1. Pre-zone 07-001A to pre-zone the Vista Canyon site to Specific Plan ("SP")

> 2. Specific Plan 07-001 to adopt a Specific Plan that includes entitlements for 1,117 dwelling units (96 single-family detached, 1,021 multi-family attached), 646,000 square feet of commercial office, 164,000 square feet of retail, and a 200-room hotel.  A residential overlay within the Specific Plan would permit the conversion of up to 250,000 square feet of the commercial office area to 233 additional multi-family attached dwelling units, permitting development of the project site with up to 1,350 dwelling units and 700,000 square feet of commercial areas.

> 3. General Plan Amendment 07-001A to amend the General Plan Land Use Map and Circulation Element in order to designate the Vista Canyon site as SP [Specific Plan], revise the Significant Ecological Area ("SEA") overlay to correspond to the area proposed as Specific Plan-Open Space ("SP-OS") and establish the alignment and roadway classification for Lost Canyon Road and Vita Canyon Road."

36

4.  <u>Tentative Tract Map 69164</u> to subdivide the 185-acre project site into 162 lots.  In addition, each individual dwelling or commercial unit would have the ability to be subdivided.

The City approved:

"Master Case 07-127, which consists of:  General Plan Amendment 07-001A (amending the General Plan Land Use Map (Exhibit A) and Circulation Element in order to designate the Vista Canyon site as SP [Specific Plan], revising the [SEA] overlay to correspond to the area proposed as Specific Plan-Open Space ("SP-OS"), and establishing the alignment and roadway classification for Lost Canyon Road and Vista Canyon Road, Specific Plan 07-001 (Exhibit B –Incorporated by Reference), Tentative Tract Map 69164 (Exhibit C- Incorporated by Reference), Conditional Use Permit 07-009, and Oak Tree Permit 07-019 for the development and annexation of Vista Canyon Ranch Project, into the City of Santa Clarita, subject to the Conditions of Approval (Exhibit D)."

The amendment of the General Plan to designate the Project area a Specific Plan area and to revise the General Plan's existing SEA areas to correspond to the area designated as Open Space in the Specific Plan, and the associated land use maps, are sufficient to satisfy Government Code section 65302, subdivision (a).  Accordingly, the amendment was not so vague as to render the amendment inconsistent with the General Plan.

C.      <u>Substantial Evidence Supports the Conclusion that the Project Will Not Have a Significant Impact on Chloride in the River</u>

SCOPE contends the City's conclusion that the Project will not significantly increase chloride (i.e., salt) content in the River is not supported by substantial evidence.  Specifically, SCOPE challenges the logic that adding 2.2 metric tons of chlorides per year (from 0.1 to 2.3 metric tons) is not significant.  SCOPE expressly does not challenge the scientific evidence upon which the conclusion is based, but argues only that "the City was unjustified in finding the addition of 2.2 tons of chloride to the River was not a significant environmental impact."

37

Because whether the Project will have a significant environmental impact is a question of fact, we review the City's conclusion for substantial evidence. (*Habitat and Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1296.) In so doing, we " ' "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' [Citation.]" (*Banning Ranch, supra*, 211 Cal.App.4th at p. 1230.) The burden is on the party challenging the EIR to affirmatively show no substantial evidence in the record supports the agency's findings. (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

Water quality is addressed in section 4.8.1 of the EIR, which summarizes the May 2010 Vista Canyon Water Quality Technical Report (Technical Report), which is attached to the Draft EIR as an Appendix. According to the Technical Report, the Los Angeles Regional Water Quality Control Board (LARWQCB) has determined that "high levels of chloride in Santa Clara River Reaches 3, 5, 6 and 7 are causing impairment of listed beneficial uses for agricultural irrigation, and irrigation of salt sensitive crops, such as avocados and strawberries, with water containing elevated levels of chloride that could result in reduced crop yields." Water treatment plants downstream of the Project, which is located in Reach 7, contribute 70 percent of the chloride load. Except during storm events of a sufficient size, surface flows in Reach 7 do not reach downstream reaches of the River.

The Basic Plan Water Quality Objective (WQO) in Reach 7 is 100 milligrams per liter;[15] the range of observed chloride concentrations in Reach 7 is between 35 and 117 milligrams per liter; the EIR predicts average annual chloride concentration in Reach 7 of 21 milligrams per liter. The Technical Report described the water quality model used to estimate that (1) current storm water runoff includes 0.1 ton of chlorides per year and (2) that the Project is estimated to increase this to 2.3 tons per year. "The historic data shows

---

[15] According to the Technical Report, the LARWQB recently presented a plan that would allow higher chloride concentrations in Reaches 5 and 6, not Reach 7.

that chloride levels upstream of the site are well below this WQO, while chloride levels . . . downstream of the site generally exceed this level." The Technical Report and EIR conclude:

> "**Comparison of Pre- and Post-Project Conditions:** Due to the conversion from open/vacant to urban land-uses . . . annual chloride load and concentration are predicted to increase when compared to existing conditions. The concentration increase is minimal and the load increase is caused by the predicted increase in runoff volume.
>
> **"Comparison With Water Quality Criterion:** The prescribed chloride concentration in post development runoff is compared to the Basin Plan water quality objective and the range of historically observed concentrations in Santa Clara River Reach 7 . . . . The predicted average annual chloride concentration in storm water runoff from the project area is well below the Santa Clara River Reach 7 Basin Plan water quality objective and the TMDL [Total Maximum Daily Load] waste load allocation for Santa Clara River reach 5 (100mg/L for both). **[Table omitted]**
>
> "Based on the comprehensive site design, source control, and treatment control strategy, and comparison with benchmark receiving water criteria and instream monitoring data, the project would not have significant water quality impacts resulting from chloride."

SCOPE expressly does not dispute the accuracy of the scientific evidence, only the correctness of the conclusion the City derives from that evidence. But we may not pass upon the correctness of the EIR's environmental conclusions, only upon its sufficiency as an informative document. (*Rialto, supra,* 208 Cal.App.4th at p. 924.) Thus, we conclude that substantial evidence supports the finding that the Project "would not have a significant water quality impact resulting from chloride."

D.    Demurrer to the Third Cause of Action Was Properly Sustained

At the heart of the third cause of action for declaratory relief is section 33207, which provides that the Conservancy "shall have a right of first refusal on any property within the [Santa Monica Mountains Zone] presently owned by a public agency and scheduled for disposal as excess lands, except where such lands are designated for

acquisition as a park or recreation area by a federal, state or local agency. . . ." (§ 33207, subd. (b).)

The third cause of action alleges that 43 acres of the Project site located in the River Corridor are owned by the City, and the Project includes sale of a portion of that land to Vista, so that Vista can "install buried bank stabilization. Such a sale constitutes disposal, and section 33207(b) requires that those portions be offered to the [Conservancy] before they are offered for sale to [Vista] (Complaint, [¶][¶] 24, 82)."[16] The complaint seeks "a declaration that the City is required by [] section 33207(b) to offer the land it owns in the bed of the . . . River within the Project Site to the . . . Conservancy." The complaint does not allege that the Conservancy wanted to purchase the land.

The trial court sustained the City's demurer to the third cause of action, finding: (1) there is no private right of action under section 33207 and (2) even if there was, SCOPE is not "beneficially interested." The trial court's interpretation of a statute presents a question of law which we review de novo. (*Fredenburg v. City of Fremont* (2004) 119 Cal.App.4th 408, 419.)

On appeal, SCOPE argues: (1) under Code of Civil Procedure section 1060, it is entitled to a declaration that the City violated Public Resources Code section 33207 and (2) it should have been given leave to amend to state a claim for a writ of mandate (see Code Civ. Proc., §§ 1085, 1086), directing the City to offer the property to the Conservancy. We find no merit in these arguments.

## 1. There Is No Private Right of Action to Enforce Section 33207

The Santa Monica Mountains Conservancy Act (the Act) was adopted in 1979 to protect for future generations "the unique and valuable economic, environmental, agricultural, scientific, educational and recreational resource" that is the Santa Monica

---

**16** Although the complaint does not specify the number of acres to be sold, paragraph PR-12 of Resolution No. 11-23, states that prior to issuance of any grading permit, Vista shall buy four acres of the City owned property.

Mountains Zone.  (§ 33001, see § 33105 [zone boundaries].)  The Act established the Conservancy, which may acquire and improve real property anywhere within the Santa Monica Mountains Zone.  (§§ 33200, 33202.5.)  Section 33207, subdivision (b) gives the Conservancy a "right of first refusal on any property within the zone presently owned by a public agency and scheduled for disposal as excess lands," but does not place any affirmative duty on public agencies to solicit the Conservancy's exercise of its right of first refusal.  "The conservancy shall, upon the request of a city or county, waive subdivision (b) of Section 33207 if it finds . . . [t]he property is within the unincorporated area of a county with a population exceeding 4,000,000 and is to be used for affordable housing . . . ."  (§ 33207.1, subd. (a)(2).)  The Conservancy may do "any and all things necessary to carry out the purposes" of the Act, including "[s]ue and be sued."  (§ 33211, subds. (c), (d).)

"A violation of a state statute does not necessarily give rise to a private right of action.  [Citation.]  Instead, whether a party has a right to sue depends on whether the Legislature has 'manifested an intent to create such a private cause of action' under the statute.  [Citations.]  Such legislative intent, if any, is revealed through the language of the statute and its legislative history.  [Citation.]"  (*Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, 596 [employees may bring action to recover tips misappropriated by the employer in violation of Lab. Code, § 351].)

Here, under section 33211, the Conservancy has the power to sue the City for any failure to comply with section 33207.  Presumably in deciding whether to bring litigation under section 33211, the Conservancy first makes a decision whether acquisition of the property serves the Conservancy's needs and the public interest.  We see nothing gained by allowing a Conservancy surrogate to complain about compliance with the first refusal statute when the Conservancy is fully capable of making that determination.  Certainly nothing in the statute itself or its legislative history suggests otherwise.

## 2. Declaratory Relief

SCOPE argues it stated a cause of action for declaratory relief under Code of Civil Procedure section 1060, which provides: "Any person . . . who desires a declaration of his or her rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties . . . . The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. . . ." We disagree.

" 'An action for declaratory relief lies when the parties are in fundamental disagreement over the construction of particular legislation, or they dispute whether a public entity has engaged in conduct or established policies in violation of applicable law.' [Citation.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79 [constitutionality of city ordinance is proper subject of declaratory relief action]; but see *Zetterberg v. State Department of Public Health* (1974) 43 Cal.App.3d 657, 663-664 ["A difference of opinion as to the interpretation of a statute as between a citizen and a governmental agency does not give rise to a justiciable controversy, [citation] and provides no compelling reason for a court to attempt to direct the manner by which the agency shall administer the  law.  [Citations.]"].)

The mere fact the parties disagree over the meaning and application of a statute does not create a justiciable controversy. "For declaratory relief, the party must show it either has suffered or is about to suffer an injury of 'sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented.' [Citation.]" (*Stonehouse Homes v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 542.)

In this case, the parties do not have differing interpretations of section 33207. There is no dispute that section 33207 gives the Conservancy the right of first refusal to purchase property being disposed of by the City. The parties agree the Santa Monica Conservancy Act provides no mechanism for public agencies to solicit the Conservancy's exercise of its right of first refusal. SCOPE maintains that, implicit in section 33207, subdivision (b), is an affirmative duty on the part of the public agency to "offer" land

42

located in the zone which the public agency intends to sell. SCOPE maintains it has standing because channeling of the River will deprive their members of the ability to "canoe, fish, swim, hike, travel, recreate and observe wildlife throughout the . . . River Watershed . . . ." But such injuries are unrelated to the declaratory relief they seek. This is because SCOPE seeks only a declaration that the City must "offer" the land to the Conservancy. Nothing compels the Conservancy to purchase the land. Accordingly, SCOPE has not shown it will suffer any injury if the property is not "offered" to the Conservancy. On the contrary, the Conservancy has the ability to enforce its right of refusal and SCOPE's alleged injuries are the result of the Conservancy not electing to do so.

### 3. Writ of Mandate

Also without merit is SCOPE's contention they should be given leave to amend the third cause of action to be a petition for writ of mandate directing the City to "offer" the property to the Conservancy.

A statute that does not create an explicit private right of action may nevertheless be the basis of a petition for writ of mandate to compel compliance. (*Doe v. Albany Unified School District* (2010) 190 Cal.App.4th 668, 682 (*Doe*).) Such a writ is available where (1) the defendant (in this case, City) has a clear, present and usually ministerial duty to perform and (2) the plaintiff (in this case SCOPE) has a clear, present and beneficial right to performance. (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 373.)

" 'A ministerial act is one that a public functionary " ' "is required to perform in a prescribed manner in obedience to the mandate of legal authority," ' " without regard to his or her own judgment or opinion concerning the propriety of such act.' [Citation.]" (*Doe, supra*, 190 Cal.App.4th at p. 682.) Mandamus does not lie to control the exercise of discretion unless, under the facts, discretion can only be exercised in one way. (See *Ghilotti Const. Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 904 [public entity

has discretion to waive inconsequential deviations from contract specifications in a public contract bid].)

While section 33207, subdivision (b) gives the Conservancy the "right of first refusal" to purchase any property in the zone which is owned by a public agency and scheduled for disposal, the statute does not prescribe any "act" that the public agency must take to "offer" the property to the conservancy. There are statutes which impose an affirmative duty on public agencies to "offer" certain kinds of land which the agency intends to sell to the public. For example, before a school district may sell or lease land that its being used as a play ground or playing field, Education Code section 17489 requires the district to "first offer to sell or lease" the land to specified public agencies. Thus, the Legislature knows how to impose an affirmative duty on public agencies to "offer" land in the zone to the Conservancy before otherwise disposing of such land, but the Legislature chose not to create such a duty. Because the statute does not describe any "ministerial duty" to be performed by a public functionary, mandamus does not lie to compel the City to "offer" the property to the Conservancy before it may sell it to Vista.

## DISPOSITION

The judgment is reversed. Each side to bear its own costs on appeal.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

44